[Crim. No. 11714. In Bank. June 18, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. WALLACE L. GRAHAM and ERNEST SHEPARD III, Defendants and Appellants.

Donald F. Roeschke and Gilbert F. Nelson, under appointments by the Supreme Court, for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and James H. Kline, Deputy Attorney General, for Plaintiff and Respondent.

TOBRINER, J.—The District Attorney of Los Angeles County filed an information against Wallace Graham, Ernest Shepard, and Judy Shepard, charging them with murder and robbery, both of the first degree. At the conclusion of a joint trial, the jury acquitted Judy Shepard but found defendants and appellants Graham and Ernest Shepard guilty of murder in the first degree and robbery of the first degree. Following a separate trial on the penalty phase for the murder convictions, the same jury fixed Shepard's penalty at death and Graham's penalty at life. Shepard's appeal before this court is automatic. (Pen. Code, § 1239, subd. (b).) Graham filed a separate notice of appeal to the Court of Appeal, Second District; we transferred the cause to this court to be heard concurrently with Shepard's appeal.

We shall point out why we have concluded, as to defendant Graham, that the judgment convicting him of first degree murder must be reversed because the trial court admitted certain prior, inconsistent, extrajudicial statements of a witness as substantive evidence of the truth of the matters asserted therein. (Evid. Code, § 1235.) In *People* v. *Johnson* (1968) 68 Cal.2d 646 [68 Cal.Rptr. 599, 441 P.2d 111], we held that extrajudicial statements admitted under section 1235 against

a criminal defendant violated his Sixth Amendment right to confront an adverse witness. The People have not sustained their burden of proving that this error was "harmless beyond a reasonable doubt." (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824].)

The judgment convicting Graham of robbery of the first degree must also be reversed because the trial court inadequately instructed the jury as to the requirement for finding one of the elements of first degree robbery, namely, that the perpetrator was "armed with a dangerous or deadly weapon." (Pen. Code, § 211a.)

We have concluded, as to Ernest Shepard, that the judgment convicting him of murder of the first degree must be reversed because the trial court failed to instruct the jury on voluntary and involuntary manslaughter in the specific context of Shepard's diminished capacity defense. (*People* v. *Conley* (1966) 64 Cal.2d 310, 318-326 [49 Cal.Rptr. 815, 411 P.2d 911]; *People* v. *Modesto* (1963) 59 Cal.2d 722, 729-731 [31 Cal.Rptr. 225, 382 P.2d 33]; see generally, *People* v. *Castillo* (1969) 70 Cal.2d 264 [74 Cal.Rptr. 385, 449 P.2d 449].)

Although defendant Shepard introduced evidence of intoxication worthy of consideration, the court did not give an adequate instruction that the jury could find defendant Shepard guilty of voluntary manslaughter due to diminished capacity from intoxication. (*People* v. *Conley, supra,* 64 Cal.2d at pp. 324-326 & fn. 4; *People* v. *Modesto, supra,* 59 Cal.2d at p. 730; *People* v. *Castillo, supra,* 70 Cal.2d at pp. 269-271.) Furthermore, the judge completely omitted an instruction that the jury could find the defendant guilty of involuntary manslaughter on this basis. Yet defendant Shepard's defense consisted of evidence that he was unconscious from intoxication caused by alcohol and drugs.

In *People* v. *Conley, supra,* 64 Cal.2d 310, we determined that evidence tending to show unconsciousness caused by voluntary intoxication requires the trial court to instruct the jury on involuntary manslaughter. (64 Cal.2d at pp. 323-325; see also, *People* v. *Wilson* (1967) 66 Cal.2d 749, 760-764 [59 Cal.Rptr. 156, 427 P.2d 820].) The failure to give such an instruction deprived defendant Shepard of his "constitutional right to have the jury determine every material issue presented by the evidence," and requires a reversal of defendant's murder conviction. (*People* v. *Modesto, supra,* 59 Cal.2d at p. 730.) We do not find the failure to give the manslaughter instructions to be invited error.

Shepard's conviction for robbery of the first degree fails because the trial court did not adequately instruct the jury on the requirement for finding that the perpetrator was "armed with a dangerous or deadly weapon." (Pen. Code, § 211a.)

### 1. The Facts.

On the afternoon of August 31, 1966, defendant Ernest Shepard and defendant Judy Shepard, Ernest's wife of four months, were at the home of Ernest Shepard's mother. Ernest left the house, went to a liquor store, purchased a fifth of wine, and, upon returning home, consumed the wine in about 45 minutes. At 6:30 p.m. Ernest's friend Wallace Graham came to visit. The two went out and bought another fifth of wine, which they shared. Returning again to the liquor store, the men purchased a pint of scotch. Back at Shepard's home, Graham drank some scotch but Ernest Shepard drank two-thirds of the bottle.

Judy Shepard awoke from a nap and saw the two men and the empty bottles. The two men spoke of getting some money. Born in Mexico, Judy had a poor command of the English language; she had planned to attend church that evening with Ernest's mother, but at her husband's insistence, she left the house with the men. Their wanderings that night eventually culminated in their arrests for the murder of Miguel Navar.

Ernest Shepard testified that before leaving the house he consumed a cube of sugar containing the chemical LSD; that he remembered nothing of the events of that night until he was in police custody. A defense witness, the Reverend Walter Sloan, testified that he observed the three defendants at approximately 10 p.m., near the corner of Adams and South Kenwood Avenue in the City of Los Angeles. Sloan observed Ernest Shepard crouched over and crying, "Oh, Lord, help me! Help me, somebody! Help me!" Sloan asked Graham if he could help, and offered the use of his brother's phone to call an ambulance. At this moment, a police car turned the corner; the defendants spoke with the officers. When the police left, the defendants had disappeared.

Except for this one occurrence, no evidence at trial disclosed the events prior to those immediately preceding the homicide. Two eyewitnesses and Judy Shepard testified that at 11:50 p.m. the three defendants were sitting on a bus stop bench near the corner of Vermont and Adams in Los Angeles. Judy testified that again there was talk of taking money from someone. The eyewitnesses testified that the three defendants

stood up and proceeded south on Vermont, following the victim, Mr. Navar. Navar went from Vermont to Dana Street and the two men followed. Judy Shepard stayed at the corner, turned to the two eyewitnesses who were sitting at a taco stand on the corner of Vermont and Adams and made a motion as if she wished them to follow. Less than two minutes after the two male defendants had rounded the corner onto Dana, Judy Shepard followed them; the two eyewitnesses ran to the corner and observed Navar lying on the sidewalk. The defendants had disappeared. Navar was bloodied, his clothing was torn, and his right pants pocket had been torn off. Navar died as a result of multiple injuries to his head and neck, caused by blows.

Officers investigating the scene of the crime discovered Navar's right pants pocket abandoned about 150 yards west of the body. Based on descriptions given by the two eyewitnesses, the defendants were apprehended and arrested at 1 a.m. several blocks from the scene of the crime.

At trial, an officer from the Scientific Investigation Division of the Los Angeles Police Department testified that the clothing worn by Ernest and Judy Shepard on the night in question contained human blood of the same type as that of the decedent. He further testified that a footprint photographed at the scene of the crime matched the shoes worn by Ernest Shepard when he was arrested.

Wallace Graham did not take the stand. Ernest Shepard did testify; his defense consisted of his alleged intoxication to the point of unconsciousness from LSD and alcohol. He described various hallucinations which he experienced that night and stated that these weird sensations, mental images, and flights of fancy blocked out all consciousness of what in fact occurred. In their case in chief, the People's police witnesses who had contact with Ernest Shepard on the night of the crime testified that he in no respect appeared to be under the influence of alcohol or any drug. Following Ernest's testimony, the People called in rebuttal a psychiatrist who cast doubt upon the likelihood that Shepard experienced continuous hallucinations as described. He further testified that if a person while under the influence of LSD attacked another he would remember the experience. On cross-examinaton, the witness conceded that the state of knowledge about the effects of LSD are such that one cannot predict with certainty the nature of a person's experiences while under the influence of

the drug, except that the drug would affect a person's ability to reason and evaluate.

Judy Shepard's testimony in her own defense provided the missing details surrounding the homicide. She testified that when her husband and Graham left the bus stop bench and proceeded after Navar, she believed they intended to rob him; that she stood on the corner and waved to the two eyewitnesses because she wanted to save Navar. When she turned onto Dana Street, she observed her husband striking Navar on the face again and again. Navar fell to the ground but Ernest continued to beat him. She walked over to the man and kneeled down to see if she could help him, thus getting blood on her clothing. She said, "Let's go. Let's go," but her husband just stared at her. She testified that her husband looked like a "dummy." Her husband then kicked Navar in the head. Before leaving the scene, both Graham and Ernest Shepard went through Navar's pockets.

During the cross-examination of Judy Shepard, counsel for Ernest introduced a statement which Judy had made to the police when they arrested her. She had told the police that Graham alone had beaten Navar; she suggested that Graham instigated the "mugging" while Shepard stood by passively. At trial, she admitted making this statement but asserted that she lied to the police because she feared her husband would "hit me like he hit the man."

Early in the proceedings, defendants Graham and Ernest Shepard moved for separate trials. The court denied these motions. Counsel had argued that a joint trial under the circumstances would be inherently prejudicial because the three defense counsel, in order to defend their individual clients, would inevitably contribute to the People's case against the other defendants. Throughout the trial, counsel for Graham and Ernest Shepard reasserted these and other objections to the nature of the proceedings and to specific tactics of the other counsel involved in the case.

The jury found Judy Shepard not guilty on all counts, but held Graham and Ernest Shepard guilty of murder of the first degree and robbery of the first degree.

After a trial on the issue of penalty, the jury fixed Ernest Shepard's penalty at death and Graham's at life imprisonment; the trial court denied defendants' motions for new trials and entered judgments of conviction for both counts.

The court sentenced Wallace Graham to the state prison and ordered that the sentences for robbery and murder run concurrently. The court sentenced Ernest Shepard to death for the murder count and stayed the sentence for robbery pending execution of the sentence on the other count. From these judgments of conviction and the sentence of death imposed upon Ernest Shepard, the defendants take this appeal.

### 2. Shepard's diminished capacity defense

Defendant Ernest Shepard raised the defense of diminished mental capacity. (See, e.g., People v. Conley, supra, 64 Cal.2d 310; People v. Modesto, supra, 59 Cal.2d 722; People v. Gorshen (1959) 51 Cal.2d 716 [336 P.2d 492]; People v. Wells (1949) 33 Cal.2d 330 [202 P.2d 53].) As to the robbery charge the trial court adequately instructed the jury that it should consider the defendant's intoxication at the time of the alleged offense and determine whether he possessed the specific intent required for the crime. As to the first degree murder charge the court instructed the jury that if it found defendant to have been subject to substantially reduced mental capacity from intoxication or any other cause it should consider whether such diminished mental capacity prevented the defendant from forming any of the specific mental states which are essential elements of murder.[1]

The trial court instructed the jury on the elements of first and second degree murder in accordance with Penal Code sections 187-189; the court also defined voluntary manslaughter as "the intentional and unlawful killing of a human being without malice aforethought and without deliberation or premeditation," but gave no instruction on involuntary manslaughter.

With respect to his instruction on voluntary manslaughter, the court proceeded in four supplemental instructions to inform the jury that manslaughter is distinguished from mur-

[1] "If you find from the evidence that at the time the alleged crime was committed, the defendant had substantially reduced mental capacity, whether caused by mental illness, intoxication or any other cause, you must consider what effect, if any, this diminished capacity had on the defendant's ability to form any of the specific mental states that are essential elements of murder. Thus, if you find that the defendant's mental capacity was so diminished that he did not, or you have a reasonable doubt whether he did, premeditate, deliberate, or form an intent to kill, you cannot convict him of a wilful, deliberate and premeditated murder of the first degree. Also, if you find that his mental capacity was so diminished that he did not, or you have a reasonable doubt whether he did, harbor malice aforethought, as it has been defined for you, you cannot find him guilty of murder of either the first or second degree."

der in that the former occurs when malice is rebutted by a showing that the mortal blow is struck in the heat of passion or is excited by a sudden quarrel amounting to adequate provocation. The court did not explicitly instruct the jury that it should find the defendant guilty of manslaughter rather than murder if it determined that malice was rebutted by evidence that the defendant's mental capacity was diminished due to mental defect, mental illness, or intoxication.

In_ *People* v. *Castillo, supra,* 70 Cal.2d 264, 269-271, we required the rendition of this latter instruction in order properly to inform the jury as to the elements of voluntary manslaughter in a case in which the defendant asserts the defense of diminished mental capacity. In *Castillo,* as in the present case, the trial court instructed the jury solely in terms of the statutory definition of voluntary manslaughter (heat of passion or sudden quarrel), and we held that the court should have instructed explicitly in terms of "nonstatutory voluntary manslaughter."[2] [1] This "nonstatutory voluntary manslaughter" is a homicide which may be intentional, voluntary, deliberate, premeditated, and unprovoked. It differs from murder in that the element of malice has been rebutted by a showing that the defendant's mental capacity was reduced by mental illness, mental defect or intoxication. (See generally, *People* v. *Aubrey* (1967) 253 Cal.App.2d 912, 918-919 [61 Cal.Rptr. 772].)

The trial court in the present case merely explained manslaughter in terms of its statutory elements as found in Penal Code section 192. Such an instruction is inadequate because it does not properly explain to the jury the existence of the nonstatutory form of the offense.[3] As in *Castillo,* we

---

[2]Voluntary manslaughter is the intentional killing of a human being without malice. Statutory voluntary manslaughter is an intentional killing in which malice is lacking because the killing occurred under circumstances of sufficient provocation such as to rouse the reasonable man to heat of passion or sudden quarrel. (Pen. Code, § 192, subd. 1.)

Nonstatutory voluntary manslaughter is the intentional killing of a human being in which the defendant did not attain the mental state constituting malice because of mental illness, mental defect, or intoxication. (*People* v. *Conley, supra,* 64 Cal.2d 310, 324-326 & fn. 4.)

[3]Furthermore, as instructed in this case, the jury reasonably could believe that the presence of "deliberation and premeditation," even in the absence, due to diminished mental capacity, of malice would prevent its finding the defendant guilty of manslaughter. The court's error of omission of the complete *Conley* instruction was thus severely compounded by its affirmative misstatement that a deliberate homicide cannot be reduced by diminished mental capacity to the offense of voluntary manslaughter.

must hold this error prejudicial per se as the defendant has suffered the denial of a jury trial on all of the issues presented by the evidence. (*People* v. *Modesto, supra,* 59 Cal.2d 722, 730-731.)

A more serious inadequacy of the instructions, however, would compel the reversal of Shepard's conviction for first degree murder in any case. Despite the fact that the defendant introduced evidence ''deserving of consideration'' (*People* v. *Modesto, supra,* 59 Cal.2d 722, 729; *People* v. *Carmen* (1951) 36 Cal.2d 768, 773 [228 P.2d 281]) that he was unconscious due to intoxication from drugs and alcohol voluntarily consumed, the trial court failed to instruct the jury on the offense of involuntary manslaughter. The reason for this failure appears in the judge's own comments on the evidence to the jury.

When speaking of the evidence that Ernest Shepard was intoxicated, the trial court told the jury that ''his mental state could either be viewed by you as being a basis for determining that he was guilty of some of the offenses, lesser offenses than those charged . . . or that he was indeed not guilty of this offense or any others, as being incapable of forming any intent in connection with the crime alleged to have been committed in this case.'' The clear implication of this statement is that if the jury were to find that Ernest Shepard was unable to form an intent to kill (i.e., he was unconscious) when he committed the alleged offense it must find the defendant not guilty of any crime. This statement inaccurately reflects the law of California and explains why the trial court erroneously failed to instruct on involuntary manslaughter.

Unconsciousness is ordinarily a complete defense to a charge of criminal homicide. (Pen. Code, § 26, subd. 5.) If the state of unconsciousness results from intoxication voluntarily induced, however, it is not a complete defense. (Pen. Code, § 22.) Intoxication may so diminish a person's mental capacity that he is unable to achieve a specific state of mind requisite to any offense; yet, if the intoxication is voluntarily induced, it can never excuse homicide. (*People* v. *Baker* (1954) 42 Cal.2d 550, 575 [268 P.2d 705].) Thus, the requisite element of criminal negligence is deemed to exist irrespective of unconsciousness, and a defendant stands guilty of involuntary manslaughter if he voluntarily procured his own intoxication. (*People* v. *Conley, supra,* 64 Cal.2d 310, 323-

324.) ▓▓▓ Thus, by failing to instruct the jury on involuntary manslaughter,[4] the trial court denied defendant Ernest Shepard his constitutional right to obtain a jury determination on every material issue presented by the evidence. (*People* v. *Modesto, supra,* 59 Cal.2d 722, 730.)[5]

### 3. *Invited error as to the manslaughter instructions*

Conceding for purposes of argument that the manslaughter instructions did not comply with the *Conley* . decision, the Attorney General argues that defendant Shepard "invited" the error because his counsel concurred in the instruction on voluntary manslaughter and in the failure to render any instruction on involuntary manslaughter. We first consider whether defendant waived or invited the error of -the court in its failure to instruct the jury on involuntary manslaughter.

The trial court formulated many instructions "on the record." At one point the court inquired whether a combination of its proposed homicide instructions satisfied the attorneys. The court said, "As I understand, everyone agrees that there is no evidence from which involuntary manslaughter could be found; the only type of manslaughter that could be found here would be voluntary." The court read its proposed voluntary manslaughter instruction. It then stated, "That combination of instructions would probably instruct the jury as to the law that's. . . ." All three defense counsel interrupted the judge and stated, "That's agreeable."

We face the question whether the trial court's affirmative

---

[4]On retrial, the trial court should instruct the jury as follows: "If you find that the defendant killed while unconscious as a result of voluntary intoxication and was therefore unable to formulate a specific intent to kill or to harbor malice, his killing is involuntary manslaughter. When a man voluntarily induces his own intoxication to the point of unconsciousness, he assumes the risk that while unconscious he will commit acts inherently dangerous to life and limb. Under such circumstances, the law implies criminal negligence."

[5]Although we need not determine the nature of the prejudicial impact of such an error (*People* v. *Modesto, supra,* 59 Cal.2d at p. 731), the trial court's failure to instruct on involuntary manslaughter and its statement to the jury to acquit Ernest Shepard if it found he lacked any intent (i.e., was unconscious) at the time of the crime clearly prejudiced his defense of diminished mental capacity. His defense was his unconsciousness at the time of the crime. The trial court erroneously gave the jury, if it believed defendant's testimony at trial, the onerous alternative of acquitting defendant of all criminal activity. The erroneous instructions might well have led the jury to be unduly suspicious of Shepard's story; on the other hand, if the jury had been properly provided with the alternative of finding defendant guilty of involuntary manslaughter, we cannot say with certainty that it would not have been more favorably disposed towards defendant's asserted diminished mental capacity.

duty to instruct the jury on its own motion on the general principles of law relevant to the issues of the case can be nullified by waiver of defense counsel. The issue embraces the violation of defendant's correlative right to the rendition of such instructions. We have already held in *People* v. *Wilson* (1967) 66 Cal.2d 749, 759 [59 Cal.Rptr. 156, 427 P.2d 820], that the "failure of defense counsel to request instructions [concerning a significant issue in the] case does not preclude defendant from raising this point on this appeal. It is settled that in criminal cases, even when not requested, the court must instruct on the general principles of law relevant to the issues raised by the evidence. (*People* v. *Jackson*, 59 Cal.2d 375, 380 [29 Cal.Rptr. 505, 379 P.2d 937]; *People* v. *Putnam*, 20 Cal.2d 885, 890 [129 P.2d 367]; *People* v. *Warren*, 16 Cal.2d 103, 116-117 [104 P.2d 1024].)'' (Fn. omitted.) Our query pertains to an attempted restriction of this general doctrine: can counsel's express concurrence in an instruction be treated as "invited error" and in that manner the general rule obviated?

In *People* v. *Phillips* (1966) 64 Cal.2d 574 [51 Cal.Rptr. 225, 414 P.2d 353], we considered the question whether the court's failure to render a manslaughter instruction in a case in which the evidence called for such a charge could constitute "invited error." We ruled that the court's responsibility could be negated only in that special situation in which the defense counsel deliberately and expressly, as a matter of trial tactics, objected to the rendition of an instruction. In that case we stated: "The record reveals . . . that defendant's counsel strongly opposed the manslaughter instruction and indicated to the trial court that he considered it 'tactically' to defendant's advantage to confront the jury with the limited choice between murder and acqittal. Thus the failure of the trial court to instruct on manslaughter, though erroneous, was invited error; defendant may not properly complain of such error on appeal. (*People* v. *Wright* (1914) 167 Cal. 1, 7 [138 P. 349]; *People* v. *Hite* (1901) 135 Cal. 76, 79-80 [67 P.2d 57]; *People* v. *Jones* (1965) 232 Cal.App.2d 379, 390 [42 Cal.Rptr. 714]; *People* v. *Johnson* (1962) 203 Cal.App.2d 624, 629-630 [21 Cal.Rptr. 650].)'' (64 Cal.2d at p. 581, fn. 4.) In each of these cited cases and in *Phillips* itself the record indicated a "deliberate" or "expressed" *tactical* decision by counsel to forego a particular instruction which the court was otherwise obliged to render to the jury.

The reason for the limitation of the invited error concept to

the narrow situation of counsel's deliberate tactical decision emanates from statutory mandate. Penal Code sections 1259 and 1469 each provide with respect to the trial court's instructions to the jury that "an appellate court may review an instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." An instruction relating to the various degrees of criminal homicide certainly affects the substantial rights of the defendant. The question in the present case, like that in *Phillips,* is whether the attorney's conduct went beyond a mere failure to object and constituted an invitation to the court, excusing the judge from giving the correct instruction on the law relevant to the issues in the case.

In the absence of a clear tactical purpose, the courts and commentators eschew a finding of the "invited error" that excuses a trial judge from rendering full and correct instructions on material questions of law. Witkin has stated that, when the trial court has the duty to instruct, *sua sponte,* on the rules of law necessarily involved in a case, erroneous instructions are reviewable "though invited by the defendant's own neglect or mistake." (Witkin, Cal. Criminal Procedure, § 746, pp. 719-720.) As the court forcefully stated in *People* v. *Keelin* (1955) 136 Cal.App.2d 860, 874 [289 P.2d 520, 56 A.L.R.2d 355], "Nevertheless, error is nonetheless error and is no less operative on deliberations of the jury because the erroneous instruction may have been requested by counsel for the defense. After all, it is the life and liberty of the defendant in a case such as this that is at hazard in the trial and there is a continuing duty upon the part of the trial court to see to it that the jury are properly instructed upon all matters pertinent to their decision of the cause." █ Accordingly, if defense counsel suggests or accedes to the erroneous instruction because of neglect or mistake we do not find "invited error"; only if counsel expresses a deliberate tactical purpose in suggesting, resisting, or acceding to an instruction, do we deem it to nullify the trial court's obligation to instruct in the cause.

This formulation correctly resolves the competing considerations of the underlying policies relevant to the problem. On the one hand, the attorney should exercise control over his case and bear responsibility for tactical decisions reached in the course of his representation. On the other hand, the Legislature has indicated that instructions which affect the sub-

stantial rights of a defendant should be subject to review, even though his counsel, through neglect or mistake, has failed to object to them. Indeed, this court has held that a trial judge must on his own motion fully and correctly instruct the jury on general principles of law, regardless of the failure of defense counsel to offer such instructions or to object to their omission.

As to the trial court's failure to render an involuntary manslaughter instruction in the present case, the record reveals that counsel for Ernest Shepard would have desired such an instruction but, because of ignorance or inadvertence, did not insist upon its rendition. Early in the colloquy among court and counsel over the proposed instructions, counsel opposed the prosecutor's suggestion that the jury not ·be instructed on second degree murder; he said, ''Of course, ·counsel [the district attorney] would like for the jury to· be put in the position—and *this is the position I don't want to. get put in*—where they either have to come back with a *first degree, manslaughter, or nothing.* I want to give them an opportunity to come back with a second degree.'' (Italics added.) This statement clearly reveals that counsel meant to submit to the jury as many options in reaching its verdict as were possible. Not only does the record fail to show any indication that counsel ''waived'' an involuntary manslaughter instruction as a matter of tactics, but it shows counsel's opposite strategy of offering the jury as many opportunities for different verdicts as possible.

As to the instruction on voluntary manslaughter, the record demonstrates that the ''error'' was not ''invited'' in any sense of that word.[6] During the discussion with the court, defendant Shepard's counsel objected to the trial court's suggested voluntary manslaughter instruction on the ground that it did not inform the jury of the type of nonstatutory voluntary manslaughter which we had promulgated in *Conley.* The trial court had defined voluntary manslaughter solely in· terms of Penal Code section 192, subdivision 1 (upon a sudden quarrel or heat of passion). Counsel objected to the statutory definition because ''that definition doesn't take into consideration the diminished capacity doctrine, the one that was had before the Connelly [*sic*] case.''

---

[6]The error with respect to the instruction on voluntary manslaughter alone would require our reversal of defendant Shepard's conviction of murder. (See discussion *supra,* pp. 314-315, fn. 1; *People* v. *Castillo, supra,* 70 Cal.2d 264.)

Purporting to understand counsel's objection, the court suggested that the elimination of any reference to ''upon a sudden quarrel or heat of passion'' would correct the defect. The instruction ultimately accepted by counsel read, ''Voluntary manslaughter is the intentional and unlawful killing of a human being without malice aforethought and without deliberation or premeditation.'' As we noted *supra,* this instruction fails adequately to instruct the jury that it could find the defendant guilty of voluntary manslaughter if his mental capacity were so diminished by intoxication or other causes that he could not harbor malice, regardless of whether he could premeditate and deliberate. Assuming that this error could have been ''invited,'' although under our analysis of *Phillips* it could not have been, a second, more serious, error with respect to the voluntary manslaughter instruction could not possibly have been ''invited.''

The court gave four extensive instructions that murder is distinguished from manslaughter ''principally'' in that malice, which is a necessary element of murder, may be rebutted by a showing that the mortal blow is struck ''in the heat of passion or is excited by a sudden quarrel such as amounts to adequate provocation,'' and that such a rebuttal of malice makes the offense voluntary manslaughter. Despite counsel's prior protestations to the trial court that the reference to ''sudden quarrel or heat of passion'' in defining manslaughter would fail to satisfy the *Conley* nonstatutory definition of voluntary manslaughter, the trial court thus proceeded to tell the jury that voluntary manslaughter consisted of a case in which malice was rebutted by a showing of sufficient provocation from a sudden quarrel or the heat of passion.

Counsel surely did not ''invite'' the error of rendering these additional ''provocation'' instructions. No reference to these last instructions appears in the recorded colloquy. The recorded exchange before the rendition of .the ''provocation'' instructions involved the voluntary manslaughter instruction to the following effect: ''THE COURT: That would expand the voluntary manslaughter as [*Conley*] says it, by simply striking 'upon a sudden quarrel or heat of passion,' and inserting the word 'and.' I would think that that takes up and solves the problem—the [*Conley*] instruction solves the problem of the effect of voluntary or other intoxication on specific intent, does it not? MR. SCARLETT: I agree.'' Counsel thus accepted an instruction which, by eliminating any reference to statutory voluntary manslaughter (sudden quarrel, heat of passion),

would have partially satisfied the required *Conley* voluntary manslaughter instruction. The court proceeded, however, to undo whatever conceivable benefit could have accrued from the elimination of the references to provocation in the initial manslaughter instruction by thereafter defining manslaughter in four succeeding instructions solely in terms of the statutory language.

The court thus told the jury that voluntary manslaughter occurred when malice was rebutted by a showing of sufficient provocation from a sudden quarrel or the heat of passion. It again omitted the manslaughter arising from diminished capacity; it again confined manslaughter to the case of provocation from sudden quarrel or heat of passion, focusing the jury's attention on the inadequate, non-*Conley* instruction. Under any possible reading of the cases, this error was not "invited"; this error necessarily comes to this court subject to our inspection and rejection, unprotected by the sought legal armor of counsel's claimed invitation.

*4. Extrajudicial statements of a witness introduced against defendant Graham for the truth of the matters asserted therein*

At trial, Judy Shepard testified that defendant Ernest Shepard perpetrated the beating and the kicking of Navar. On cross-examination, counsel for Ernest Shepard, for impeachment purposes and as proof of the truth of the matters contained in the statements, sought to introduce Judy's prior inconsistent assertions to the police. Counsel for defendant Graham objected on the ground that the statements were hearsay as to Graham, and that the statements, even if admitted for impeachment purposes alone, would prejudice Graham's case in violation of the "spirit" of *People* v. *Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265].

Despite Graham's protestations, the trial court allowed the following statements to be admitted as substantive evidence, without a limiting instruction as to the purpose for which the jury might consider them:

"Q. Mrs. Shepard, in the conversation that you had with the police officer, did you tell the police officer that the defendant Graham kept saying he needed some money?

"A. Yes.

"Q. Did you also tell the police officer that, 'A white man passed us, and Graham started following him'?

"A. Yes.

"Q. Did you also tell the police officer that, 'My husband went after his friend, and I followed, also'?

"A. Yes.

"Q. Did you tell the police officer that, 'We went about a block and turned onto a side street'?

"A. Yes.

"Q. Now, did you also make the statement that, 'Graham began fighting with the white man and knocked him down'?

"A. Yes, I said that.

"Q. Did you say also at this same time, 'I ran to my husband and held him while his friend ripped the white man's pants and shirt pockets'?

"A. Yes, I said that.

"Q. Did you also tell him that, when you saw blood, you told your husband, ' "We should leave," and we went up to Washington Boulevard and walked until we were stopped by the police'?

"A. Yes.

" . . . . . . . . . .

"Q. Is it your testimony that the statement you made to the police officer was not true? Is that correct?

"A. No, it's not true.

"Q. And the only reason you made the statement was because you were afraid of your husband?

"A. Yes."

At the time of the trial, Evidence Code section 1235 rendered prior inconsistent statements of a witness admissible as substantive evidence of the truth of the matters asserted therein.[7] Section 1235 thus abrogated the well-settled. rule that a prior inconsistent statement of a witness could be admitted only for the limited purpose of impeachment. (See, e.g., *People* v. *Orcalles* (1948) 32 Cal.2d 562, 572-573 [197 P.2d 26].)

We held in *People* v. *Johnson, supra,* 68 Cal.2d 646, that Evidence Code section 1235, when applied against a defendant in a criminal case, deprived him of his right to confrontation guaranteed by the Sixth Amendment to the United States Constitution. Similarly, in the present case, because Graham could not confront and cross-examine Judy Shepard

---

[7]Evidence Code section 1235 requires as a precondition to the admission of the statement as substantive evidence that the witness not have been excused or that the witness be given an opportunity to explain or deny the prior statement at some point in the trial.

contemporaneously with her making of the statements, Graham has been denied the opportunity effectively to cross-examine her as to the statement given to the police officer. (*People* v. *Johnson, supra,* 68 Cal.2d at pp. 658-659.)[8]

The Attorney General argues that the present case differs from *Johnson* in that the statements introduced here were intended to be used only for impeachment purposes. Refuting this assertion, the instant record reveals that counsel for defendant Ernest Shepard, in introducing the statements, argued their admissibility to the court "not only for the purpose of impeachment, but also to prove by this witness the truth of the matters contained in her statement." Indeed, the trial court allowed the statements into evidence with the comment, "I think [the statements] are proper for impeachment, and proper as evidence in chief, to prove the truth of the matter." Counsel for defendant Graham requested that the trial court limit the jury's application of these statements to impeachment of the witness only and not for use against defendant Graham. The court denied this request, giving no limiting instruction or warning to the jury.

The Attorney General further argues that this case differs from *Johnson* in that the court here did not, as in *Johnson,* specially instruct the jury to treat these statements as proof of the truth of the matters therein asserted. In *Johnson* the court did give an inapposite "former testimony" instruction relating to the exception to the hearsay rule for testimony adduced in a prior criminal proceeding. Although we noted that this instruction did not even purport to apply to some of the *Johnson* statements that were extrajudicial prior inconsistent assertions, we nevertheless held that the introduction as substantive evidence of all of the *Johnson* statements violated defendant's Sixth Amendment right of confrontation. We explained that the trial court did not limit the statements to impeachment purposes. (*People* v. *Johnson, supra,* 68 Cal. 2d 646, 651, fn. 4.) In the present case, the trial court neither limited the extrajudicial statements to impeachment purposes

[8]In *Johnson,* the People introduced the statements which we deemed to violate the defendant's Sixth Amendment right to confrontation. The Attorney General asserts that, since the prosecution expressly disavowed joining in introducing the statements of the present case, defendant Graham cannot complain that the *state* abrogated his constitutional right to confrontation. A careful reading of *Johnson* reveals that the fact of possible prosecutorial misconduct was irrelevant to the decision. In the present case the state, in the form of the trial judge, violated defendant Graham's Sixth Amendment rights by admitting the statements under Evidence Code section 1235.

nor granted the requested limiting instruction. Without such an instruction, the jury could not know that it should not rely upon these statements as substantive evidence introduced during the trial.

Because the error encompasses federal constitutional rights, we apply the test laid down in *Chapman* v. *California, supra,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824]. (*People* v. *Johnson, supra,* 68 Cal.2d 646, 660.) If believed, the statements cast defendant Graham as the agressor in the robbery-homicide. The Attorney General argues that the conviction of both Graham and Ernest Shepard of robbery and murder and the acquittal of Judy Shepard proves beyond a reasonable doubt that the error did not contribute to the jury's verdict— that the jury accredited Judy's in-court testimony as to what happened that night as well as her testimony that she lied to the police officer. We cannot say with sufficient certainty that the verdict proves that the jury believed all of Judy's in-court testimony. Judy's poor understanding of English and her recent arrival in this country may have convinced the jury that Judy innocently followed the men and knew nothing of their criminal intentions. Furthermore, the testimony of Roman and Santos that Judy signalled as if for help serves as an independent basis upon which the jury could have acquitted her.

The fact that the jury found both Ernest Shepard and Graham guilty of robbery and murder of the first degree proves nothing about the impact of the extrajudicial statement. The statement, in fact, provided an additional theory upon which the jury could have found both men guilty: The jury could have found that Graham was the principal aggressor in the robbery and murder, but that Ernest Shepard aided and abetted him in the commission of those crimes.[9]

We must conclude that the error creates a reasonable possibility that it might have contributed to the conviction (*Fahy* v. *Connecticut* (1963) 375 U.S. 85, 86-87 [11 L.Ed.2d 171, 172-173, 84 S.Ct. 229]); we cannot say that the People have proved that the error was "harmless beyond a reasonable doubt." (*Chapman* v. *California, supra,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824].) The judgment convicting

---

[9]The trial court instructed the jury on aiding and abetting, and correctly told it that aiders and abettors are to be considered principals in any crime. (Pen. Code, § 31.)

Wallace Graham of murder of the first degree therefore must be reversed.[10]

*5. Sufficient evidence supports defendants' conviction for robbery*

Penal Code section 211 defines robbery as "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." Judy Shepard testified that the other defendants discussed taking money from someone before they stood up and followed Navar. This evidence coupled with Roman's and Santos's observations and Judy Shepard's account of the beating and fleecing of Navar adequately supports a finding of attempted robbery.

Defendants argue, however, that to convict for the substantive crime of robbery, the People must prove the element of asportation, the robber's escape with the loot. (See, *People* v. *Anderson* (1966) 64 Cal.2d 633, 639 [51 Cal.Rptr. 238, 414 P.2d 366]; cf., *People* v. *Ketchel* (1963) 59 Cal.2d 503, 523 [30 Cal.Rptr. 538, 381 P.2d 394].) Defendants argue that the prosecution adduced no evidence that the would-be robbers actually took anything of value from Navar.

Evidence in the case, however, clearly supports the inference that defendants ripped off Navar's pants pocket and carried it 150 yards down the street. Defendants argue that the evidence does not disclose that they actually found anything of value in the pocket; furthermore, that they obviously did not harbor the intent to steal the pocket as such from the decedent, but only to deprive him of its contents. Although defendants correctly assert that we may not assume that the pocket contained any particular article, they err in contending that a conviction for robbery cannot stand upon evidence that they merely robbed Navar of his pocket.

If the evidence supports the elements of the offense of robbery, the lack of value of the asported matter cannot efface the crime. (See, *People* v. *Simmons* (1946) 28 Cal.2d 699, 705

---

[10]We discuss *infra* the basic reason why defendant Graham's conviction for robbery of the first degree must be reversed. The error in admitting the extrajudicial statement of Judy Shepard in violation of Graham's Sixth Amendment right to confrontation would also require reversal of the robbery conviction. Because the statement, if believed, offered an additional theory upon which the jury could find the defendant guilty of first degree robbery (that Graham was the active participant in the robbery and Shepard aided and abetted), we cannot say beyond a reasonable doubt that the error might not have contributed to the result. (*Chapman* v. *California, supra,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824].)

[172 P.2d 18].) Since the jury here could reasonably find that defendants intended to take away the pocket of decedent's trousers, this finding would support the conviction even if the pocket were empty. We cite the obvious analogy of the more typical case in which a defendant, by means of force or fear, takes a man's wallet and, after finding it to be empty, casts it aside. We cannot doubt that the defendant in such a case would be guilty of robbery.

*6. The trial court did not adequately instruct the jury on the elements of robbery of the first degree*

To convict defendants of robbery of the first degree, Penal Code section 211a requires that the robbery be perpetrated by a person "armed with a dangerous or deadly weapon." Here the record shows that Ernest Shepard kicked the victim and that he wore shoes. Although, as we shall point out, the shod foot may be used in such a manner and with such intent as to constitute a dangerous or a deadly weapon, the jury must so find; here, in the absence of an instruction drawing to the attention of the jury the requirement for such finding, we cannot uphold conviction of robbery of the first degree.

Although the manner of the use of an object does not automatically determine whether a defendant was "armed with a dangerous or deadly weapon," the method of use may be evidence of the intent of its possessor. In *People* v. *Raleigh* (1932) 128 Cal.App. 105 [16 P.2d 752], the District Court of Appeal, per Spence, J., adopted a position appropriate to the present case, "that a distinction should be made between two classes of 'dangerous or deadly weapons'. There are, first, those instrumentalities which are weapons in the strict sense of the word, and, second, those instrumentalities which are not weapons in the strict sense of the word, but which may be used as such. The instrumentalities falling in the first class, such as guns, dirks and blackjacks, which are weapons in the strict sense of the word and are 'dangerous or deadly' to others in the ordinary use for which they are designed, may be said as a matter of law to be 'dangerous or deadly weapons.' This is true as the ordinary use for which they are designed establishes their character as such. The instrumentalities falling into the second class, such as ordinary razors, pocket-knives, hatpins, canes, hammers, hatchets and other sharp or heavy objects, which are not weapons in the strict sense of the word and are not

'dangerous or deadly' to others in the ordinary use for which they are designed, may not be said as a matter of law to be 'dangerous or deadly weapons.' When it appears, however, that an instrumentality other than one falling within the first class is capable of being used in a 'dangerous or deadly' manner, and it may be fairly inferred from the evidence that its possessor intended on a particular occasion to use it as a weapon should the circumstances require, we believe that its character as a 'dangerous or deadly weapon' may be thus established, at least for the purposes of that occasion." (128 Cal.App. at pp. 108-109.)

In the present case, the jury could conclude that Ernest Shepard's shoe was a "dangerous or deadly weapon" only if the jury could find that the shoe could be used in a dangerous or deadly manner and that the defendant intended so to use it. The manner in which Shepard did use the shoe in the present case serves as evidence that it could be used as a dangerous or deadly weapon and that he intended to use it as such against the decedent. If the jury had been instructed in accordance with Raleigh,[11] no question would arise as to the sufficiency of the evidence on this issue.

As Raleigh points out, however, a critical jury issue does arise in a case such as the present in which the defendant employs an instrumentality which in the strict sense of the

---

[11] As the present case involves an instrumentality (a shod foot) which is not as a matter of law a "dangerous or deadly weapon," on remand the trial court should render the following instruction:

Robbery is the felonious taking of personal property of any value in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear.

Robbery which is perpetrated by a person or two or more persons any one of them being armed with a dangerous or deadly weapon is robbery of the first degree. Robbery which is not of the first degree is robbery of the second degree.

If you should find the defendants or any one of them guilty of robbery, it will be your duty to determine the degree thereof and to state that degree in your verdict.

Before you may find a defendant guilty of robbery of the first degree, you must find the following to be true beyond a reasonable doubt: (1) that the defendant is guilty of robbery as I have defined it; (2) that at least one of the perpetrators of the robbery possessed an instrumentality which was capable of being used by him in a dangerous or deadly manner; and (3) that its possessor intended to use the instrumentality in the robbery as a weapon of offense or defense should the circumstances require.

If you find a defendant guilty of robbery but find none or only one of the other two requirements to have been established beyond a reasonable doubt, you must find that defendant guilty of robbery of the second degree. If, however, you find all three of the above-mentioned requirements to have been established beyond a reasonable doubt, you should find that defendant guilty of robbery of the first degree.

word does not constitute a dangerous or deadly weapon. The issue then turns on whether the instrumentality was one which, under the control of the perpetrator of the robbery, could be used in a dangerous or deadly manner and whether the perpetrator intended to use it as a weapon. In the absence of an instruction explaining the requisites for a finding that the defendant was "armed with a dangerous or deadly weapon," the jury could not rationally apply the language of Penal Code section 211a to the facts of this case.

 The general rule which provides that in defining the elements of a crime it is enough for the court to instruct in the language of the statute when the defendant fails to request an amplification thereof (*People* v. *Reed* (1952) 38 Cal. 2d 423, 430 [240 P.2d 590]) will not prevail when the jury would have difficulty in understanding and applying the statute. Under such circumstances, a court must give additional guidance and clarification on its own motion. (*People* v. *Thomas* (1945) 25 Cal.2d 880, 895 [156 P.2d 7]; see also, *People* v. *Failla* (1966) 64 Cal.2d 560, 565 [51 Cal.Rptr. 103, 414 P.2d 39].) In a robbery case, such as the instant one, in which the instrumentality used is neither a weapon in the strict sense of the word nor "dangerous or deadly" to others in the ordinary use for which it is designed, the trial court should specify the issue which the jury must resolve in the form suggested by *Raleigh*.

 By instructing the jury simply on the language of section 211a, the trial court did not focus the jury's attention on whether defendant intended to use the shoes as a weapon or merely to attack the deceased with his hands and feet. (See *People* v. *Dozie* (1964) 224 Cal.App.2d 474, 476-477 [36 Cal. Rptr. 728], in which case the District Court of Appeal held that the use of fists alone could not form the basis for a conviction of first degree robbery since the defendant did not arm himself with any weapon.) Cases which support a finding that a shod foot was a "dangerous or deadly weapon" within the meaning of section 211a—without requiring such a special instruction to the jury—are hereby disapproved. (Cf. e.g., *People* v. *Smith* (1967) 253 Cal.App.2d 299, 304 [61 Cal.Rptr. 457]; *People* v. *Bennett* (1962) 208 Cal.App.2d 317, 320 [25 Cal.Rptr. 257]; *People* v. *Wood* (1961) 192 Cal.App.2d 393, 396-397 [13 Cal.Rptr. 339].)

We conclude that, in the absence of a proper instruction, the jury could not rationally have applied the language of Penal Code section 211a to the facts of this case; since it is

reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]), we must reverse on this issue.

Having determined that the judgments of conviction on all counts must be reversed, we proceed to deal with one significant question which is likely to arise on retrial.

*7. Under the circumstances of this case, defendant Graham is entitled to a severance on remand*

■ In California, the Legislature has expressed a general preference for joint trials (Pen. Code, § 1098; see *People* v. *Lara* (1967) 67 Cal.2d 365, 394 [62 Cal.Rptr. 586, 432 P.2d 202]). The matter of granting separate trials remains largely within the discretion of the trial court. In the case of *People* v. *Aranda, supra*, 63 Cal.2d 518, we established the rule that a trial judge must grant a severance when the prosecution proposes to introduce into evidence a confession of one defendant that implicates a codefendant.[12] In most situations, however, the trial judge may decide this question in his discretion based upon the proffered grounds upon which one defendant seeks to obtain a severance. Among the relevant reasons which this court has recognized as grounds for granting a motion for a separate trial are: "an incriminating confession, prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony." (Fns. omitted.) (*People* v. *Massie* (1967) 66 Cal.2d 899, 917 [59 Cal.Rptr. 733, 428 P.2d 869].)

■ Moreover, the trial court should grant a severance "if it can be shown that the [prosecution's] insistence on joint trial was not in good faith, or that it was solely for the purpose of obtaining an otherwise illegal delay, or to take unfair advantage of the defendants, or was not reasonably predicated upon the purpose and intent of the statute which grants the right to try the defendants jointly." (*People* v. *Clark* (1965) 62 Cal.2d 870, 883 [44 Cal.Rptr. 784, 402 P.2d 856].)

Since we must reverse the convictions in the present case in any event, we need not reach the question whether the trial court erred in refusing to grant the motions for severance urged during the trial. ■ On remand, however, defend-

---

[12]See *Bruton* v. *United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620], in which the Court held the rule of *Aranda* to be a rule of federal constitutional law (Sixth Amendment right to confrontation).

ant Graham may renew his motion for a separate trial, and we should now pass on the merits of such a motion in the light of our holding, *supra*, that the tactics of counsel for Ernest Shepard resulted in defendant Graham's being deprived of his right to confrontation and effective cross-examination in violation of the Sixth Amendment to the United States Constitution.

Defendant Graham would be entitled to a severance if the trial court concludes that Ernest Shepard's counsel probably again will introduce Judy Shepard's extrajudicial statements for the truth of the matters asserted therein. *People v. Johnson, supra,* 68 Cal.2d 646, did not nullify Evidence Code section 1235. The precise holding of that case is limited to the situation in which the section is "applied against a defendant in a criminal case." (68 Cal.2d at p. 660.) The section retains its vitality in civil cases; furthermore, nothing in the holding of *Johnson* precludes a defendant from using the section when another defendant's Sixth Amendment rights are not thereby transgressed. We do not violate *Johnson* by allowing defense counsel to introduce, in a separate trial of Ernest Shepard, the extrajudicial statements for the truth of the matters asserted, while forbidding, in a trial of Wallace Graham, the prosecution or a codefendant to introduce the statements under section 1235.

 If, however, the People insist upon joint trials, an irreconcilable conflict arises between the two defendants. Under such circumstances, a trial court should grant a severance unless it can conclude that the defendant's interest in introducing the statements for the truth of the matters asserted therein is insubstantial.[13] In light of the extreme importance of a defendant's right to introduce any and all evidence relevant to his case, we have concluded that Shepard's interest in introducing the statements as substantive evidence is substantial. Accordingly, if the People insist upon joint trials in the face of the clearly conflicting tactics of the two defendants, the trial court should grant a severance.

The convictions of robbery of the first degree and murder of the first degree entered against defendants Ernest Shepard

---

[13]The statements could be introduced without a severance if their prejudicial aspects could be deleted without impairing their value as substantive evidence favoring the defendant who introduces them. (Cf. *People* v. *Aranda, supra,* 63 Cal.2d 518, 530.) In the present case and in most cases deletion is impossible because the prejudicial impact of the statements upon the codefendant constitutes the main value of the statements to the defendant who seeks to introduce them.

and Wallace Graham are reversed. The 'case is remanded to the Los Angeles County Superior Court for further proceedings consistent with this opinion.

Traynor, C. J., and Peters, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

McCOMB. J.—I dissent. I would affirm the judgments of the trial court in their entirety.