[Crim. No. 16877. In Bank. Dec. 26, 1973.]

THE PEOPLE, Plaintiff and Respondent, v.
VALERIE DAWN KELLY, Defendant and Appellant.

## COUNSEL

James A. Hutchens, under appointment by the Supreme Court, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, William E. James, Assistant Attorney General, Elaine A. Alexander, Patrick J. Hennessey, Jr., and Harley D. Mayfield, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**SULLIVAN, J.**—Defendant Valerie Dawn Kelly was charged in count one of an information with assault with a deadly weapon with intent to commit murder (Pen. Code, § 217),[1] in count two thereof with attempted murder (§§ 187, 664) and in count three with assault with a deadly weapon and by means of force likely to produce great bodily injury (§ 245, subd. (a)). Defendant pleaded not guilty and not guilty by reason of insanity to all counts. Trial by jury was waived, counts one and two were dismissed by the court on the People's motion on the ground of insufficiency of evidence, and the court found defendant guilty of assault with a deadly weapon in violation of section 245, subdivision (a). The court thereafter found that defendant was legally sane at the time the offense was committed. Imposition of sentence was suspended and defendant was granted probation for a period of five years under specified terms and conditions. She appeals from the judgment of conviction. (§ 1237.)

Defendant has used drugs ever since she was 15 years old.[2] In the fall

---

[1] Hereafter, unless otherwise indicated, all section references are to the Penal Code.

[2] In 1968, following a call by her parents to the police, defendant, then just 16 years old, was taken into custody for being under the influence of drugs. She spent three weeks in a ward of the county mental health clinic for abuse of habit-forming drugs and was released on two years' probation. In December 1968, she voluntarily entered Patton State Hospital, after again being found under the influence of drugs. Two months later, she ran away from the hospital but refrained from using drugs

of 1970, when she was 18 years old, she began taking mescaline and LSD, using those drugs 50 to 100 times in the months leading up to the offense. On December 6, 1970, her parents received a telephone call that defendant was being held at the police substation located at the Los Angeles International Airport after being found wandering about the airport under the influence of drugs. In response to the call, her parents picked up defendant at the airport and drove her back to their home in San Diego. Although they recognized that she was not acting normally, at defendant's request they drove her to her own apartment where she spent the night.

On the next morning, December 7, defendant telephoned her mother and asked to be driven to her parents' home. Mrs. Kelly did so but noticed that defendant "wasn't there"; she seemed to be "[j]ust wandering" and told her mother that she heard "a lot of noises, and a lot of people talking . . . ."[3] Mrs. Kelly made defendant change into pajamas and lie down, and then went into the kitchen to prepare defendant's breakfast. Shortly thereafter, defendant entered the kitchen and, while Mrs. Kelly was turned toward the stove, repeatedly stabbed her mother with an array of kitchen knives. The police were called, defendant was arrested, and eventually charged as already indicated.

On December 14, 1971, the case proceeded to trial before the court sitting without a jury.[4] The parties waived their right to a bifurcated trial on the separate issues of guilt and insanity (Pen. Code, § 1026), and agreed that the court upon receiving evidence at a single trial, could separately decide the two issues after allowing counsel to argue as to each. (*People* v. *Dessauer* (1952) 38 Cal.2d 547, 554 [241 P.2d 238]; see generally Witkin, Cal. Criminal Procedure (1963) § 502, p. 508.)

Much of the evidence presented at the trial consisted of the reports and testimony of seven psychiatrists. Since there was substantial agreement

---

until the period preceding the instant offense. In November 1970, about a month before the offense here involved, defendant was again taken into custody for drug abuse and spent several days in the county mental health clinic after which she was released.

[3]In a psychiatric report made after the attack and introduced into evidence, defendant described her hallucinations at this time. She thought that her parents "were with the devils." She would talk to her parents "but not out loud." Her mother "told" her that "they had devils," and defendant "realized that something was going to die —that they were going to kill me."

[4]Before defendant could be tried, the trial court, doubting her competency, ordered a hearing to determine whether she was presently sane. (Pen. Code, §§ 1367, 1368.) The court found that defendant was insane and ordered her committed to Patton State Hospital. (Pen. Code, § 1370.) She remained there for nine months and was released in September 1971, after being certified as sane and able to stand trial. (Pen. Code, § 1372.)

among them, we briefly summarize their testimony, referring to illustrative examples of it in the footnotes.

Defendant suffered from personality problems—according to one witness an underlying schizophrenia—but was normally a sane person.[5] However, her voluntary and repeated ingestion of drugs over a two-month period had triggered a legitimate psychosis[6] so that on the day of the attack, defendant was unable to distinguish right from wrong.[7] Nevertheless,

[5]The testimony of several psychiatrists showed that defendant had underlying personality defects accompanied by a "schizoid personality," which denotes a tendency to withdraw from reality but is not as severe as schizophrenia. "She was not overtly schizophrenic. . . . Normally sane, but she did have a character disorder [even before her period of drug abuse]."

[6]Dr. Vines, a psychiatrist from Patton State Hospital who was called as a witness on behalf of the court, testified in response to examination by the prosecution that, in his opinion, defendant was psychotic as early as November 1970, one month before the attack. He continued: "From what we know of the abuse of LSD and/or mescaline, 50 to 100 trips over a one or two-month period would have been enough to make her psychotic, a condition referred to, psychiatrically, as a pathological intoxication, so that the brain damage brought about by the hallucinogen, in my opinion, would have made her dingy, or psychotic, or insane—and I'm using these words almost interchangeably—for a considerable period of time, so that one additional mescaline trip might very well not have made any difference.

"Q. But if she hadn't taken drugs during the period of time that you have described, and presuming she was telling you the truth, in your opinion, would she have been psychotic on December 7th barring any use of drugs?

"A. I think she would have been sane at that time—December 7th—if she had avoided drug abuse for that one or two-month period that she referred to.

"Q. And, Doctor, presuming that she had not taken drugs before December 7th within the time span of a month or two, to the degree that she did, in your opinion, would she have stabbed her mother?

"A. I doubt that she would have very much."

Testimony of other psychiatrists corroborated this opinion. However, one of them, Dr. Lengyel, testified for the court that defendant's schizophrenia would have developed even if she had not taken drugs.

[7]According to three different psychiatrists, whose reports were admitted into evidence, defendant was psychotic or insane at the time of the offense. The report of Dr. Paul Strauss, made approximately one year after the offense, is illustrative:

"Evaluation and Recommendations: In my opinion, Miss Kelly is presently sane, is in adequate contact with reality, knows the nature of the charges against her and can cooperate with her attorney, if she so chooses. *It is also my opinion that Miss Kelly was legally insane at the time of the crime with which she is charged; that is, she did not know right from wrong and could not have refrained from doing the wrong if she so chose.* In my opinion, she had a pre-existing mental condition upon which was superimposed a voluntary intoxication which brought about a condition of blatant psychosis (pathological intoxication) which was in effect at the time of her crime. When and if she is released from custody. I think it would be extremely important that she be maintained under the supervision of the court for an extended period of at least two years to see that she gets adequate psychiatric aftercare. I would also recommend that she not live with her parents since this appears to be extremely stressful for her." (Italics added.)

defendant was conscious in that she could perceive the events that were taking place.[8]

The trial court heard considerable testimony that defendant was not acting simply as a person who, after ingesting drugs or alcohol is unable to perceive reality and reason properly. Rather, the drug abuse was deemed the indirect cause of a legitimate, temporary psychosis that would remain even when defendant was temporarily off drugs.[9] Finally, there was general agreement that defendant, although still a "brittle" person with latent schizophrenic tendencies, was sane at the time of trial.

At the conclusion of all the evidence, the prosecutor and defense counsel presented their arguments to the court on the guilt phase of the case. The court then in essence found that defendant did the acts constituting an assault with a deadly weapon, that at such time she was not in a state of unconsciousness,[10] and that defendant was "guilty as charged."

---

[8]Dr. Vines testified under questioning by the defense that at the time of the offense defendant "was conscious, . . . but I don't feel she was in reality." Dr. Strauss, called on behalf of both the People and the defense, stated in response to the prosecutor's inquiry about his meaning when he said that defendant was conscious:

"A. Well, I'd say that she was awake, and her arms and legs, her body, was functioning. Her brain was reasoning after a fashion, so that she would be conscious, as opposed to comatose.

"Q. But the distortion then was in her thinking, but she was thinking; would that be a fair statement?

"A. Yes.

"Q. And so if that were the definition of conscious, you would say she was conscious, is that correct?

"A. Medically, yes."

[9]It is important to note that defendant's psychosis was not merely temporarily related to the period in which she was under the influence of drugs. The testimony of Dr. Strauss made this clear, when he characterized defendant's insanity as "A temporary psychosis or temporary insanity brought about by an extended drug abuse with hallucinogens and not recovering very quickly [———] taking, I would estimate, until she was released from Patton State Hospital, a period of some nine or ten months." Similarly, Dr. Carl Lengyel testified that defendant's psychosis, although drug-induced, would continue even after she went off the drug. Dr. Alfred Larson testified that her psychosis, which was due to an organic disturbance of the brain cells, could last anywhere from two weeks to two years' time.

[10]The court stated in pertinent part: "The state of mind existing at that time was certainly not a state of unconsciousness, as it has been defined here in a medical sense; that is, the defendant was not in a coma, or incapable of locomotion or manual action.

"While I have some doubt, I am not sure that I can say the doubt is a reasonable one, whether the defendant was conscious of acting at that time. I rather think, taking the case all round, it would have to be said that she had a sufficient consciousness of acting, as deranged as she was in other respects, to hold that the defense of unconsciousness is not available to her.

"Apparently, the test is not whether one was capable of governing her actions through the strength of will, but whether the person acted in some fashion conscious

After a recess, counsel for both parties then presented their arguments on the sanity phase of the case. At the conclusion of the arguments the court found that while defendant was indeed psychotic both before and after the attack, and "was not capable of understanding that her act was wrong," her insanity was no defense because it "was not of a settled and permanent nature, and, in addition, was produced by the voluntary ingestion of hallucinatory drugs."[11] Accordingly the court found that defendant

of the acts taking place. That consciousness, I think the defendant had, although the feed in certainly was into a mind not capable of controlling the act.

"I would be willing to say that the evidence persuades me that her consciousness was intermittent during those very bad hours on December 7. I think that is true. I don't think there is any evidence that the defendant was fully aware of what she was doing from stem to stern on that day, or in that kitchen, but she was shown to have been intermittently aware of her actions. And I think that is all the law requires.

"I would have to find, in addition to that, that the extent to which defendant intermittently was not aware of her actions, was the product of drug intoxication voluntarily induced."

[11]We set forth the following pertinent portions of the court's statement: "I think that the evidence shows the defendant to have had, prior to any of the events in question in this trial—and prior to at least November of 1970—an anti-social personality. I understand that word to be the same as quote one with personality deficits close quote.

"Because of the voluntary ingestion of drugs, including LSD, and mescaline and others, the defendant some time in November began suffering from a psychosis. I mean to say that the drugs produced the psychosis in the sense that without the drugs she would have been left, for all we can determine here, as a person simply with personality deficits.

". . . . . . . . . . . . . .
"And there is evidence here that the psychosis, characterized by the doctors as schizophrenia, was operating on this defendant from some time in November, at least through December and beyond the date of December 7.

". . . . . . . . . . . . .
"Certainly, she had intervals of acting out, I think is the word that they use to express some anti-social conduct. And that is as far, really, as you could find. *But, in any event, on the date of the crime, December 7th, because of the psychosis that existed then, and had for a little while on both sides of the date of the crime, such a condition of the mind that she was not capable of understanding that her act was wrong. And the record is full of references to out of touch with reality and so forth.*

". . . . . . . . . . . . .
"And so I would say that in the face of the finding that *in lay terms she did not know what she was doing close quote on December 7th,* she nevertheless must be held criminally responsible for her acts on that day, because the psychosis, which I would have to find to be characterized as schizophrenia on December 7th, was not of a settled and permanent nature, and, in addition, was produced by the voluntary ingestion of hallucinatory drugs.

"Now, that is a legal decision and not a medical decision, because I have attempted to make findings here from this evidence which meets directly what counsel have argued to me as their view of the issues involved. And I think the evidence has been that on December 7, and for some time before and some after, she was suffering this psychosis.

"I do not believe it more than a temporary psychosis, when measured by testimony of the doctors as to her condition, from time to time, beginning back in 1968 to the present, and when measured by the testimony concerning the duration of effects from voluntary ingestion of LSD.

was legally sane at the time the offense was committed. As already stated, the court eventually suspended imposition of sentence and granted probation.

■ Defendant contends (1) that the evidence before the court established a defense of unconsciousness and (2) that insanity, however caused, was a defense to section 245, subdivision (a), a general intent crime.

In support of her first contention, defendant argues that the evidence showed her to be psychotic at the time of her actions. She relies on the court's findings that there was no evidence she was fully aware of what she was doing on the day of the assault but was shown to have been intermittently aware of her actions. (See fn. 5, *ante*.) She urges that the only determination to be made by the trial court was whether she was in fact unconscious at the time of her acts and that the fact that such unconsciousness was the product of drug intoxication voluntarily induced should not negate the defense.

Section 26, subdivision Five, designates as among those persons deemed incapable of committing crimes "[p]ersons who committed the act charged without being conscious thereof." In *People* v. *Methever* (1901) 132 Cal. 326, 329 [64 P. 481], this court observed that the above section "contemplates only cases of persons of sound mind, —as, for example, somnambulists, or persons suffering with delirium from fever or drugs." Nevertheless, as Witkin points out it may have other applications—as, for example, to a person suffering from a blow causing a "black out" or to a person in an epileptic fit. (1 Witkin, Cal. Crimes (1963) pp. 138-140.) More recently in *People* v. *Newton* (1970) 8 Cal.App.3d 359, 376 [87 Cal.Rptr. 394], the court declared that " 'Unconsciousness,' as the term is used in the rule just cited [i.e., § 26, subd. Five] need not reach the physical dimensions commonly associated with the term (coma, inertia, incapability of locomotion or manual action, and so on); it can exist—and the above-stated rule can apply—where the subject physically acts in fact but is not, at the time, conscious of acting. [Fn. omitted.]"

"When measured by those things, it is temporary although certainly, in terms of elapsed time, a less temporary thing than Mountain Red. And so, *in spite of the fact that she did not know that what she was doing was wrong on December 7th, despite the fact that the reason she did not know was infliction with a mental condition described as schizophrenia, despite the fact that that condition had endured prior to the crime at least back into November and endured thereafter, certainly the rest of the month of December and probably longer,*—parenthetically, it is hard to tell because they began dosing her up with other things at Patton, so you don't really know—*despite those facts, I hold that the law does not admit of a defense to the crime charged by reason of legal insanity, because the schizophrenia is not of a settled, permanent nature, and was produced in the first place by the ingestion of hallucinatory drugs and other drugs. . . .*" (Italics added.)

While there are broad statements in the cases that unconsciousness is a complete defense to a criminal charge (see, for example, *People v. Wilson* (1967) 66 Cal.2d 749, 761 [59 Cal.Rptr. 156, 427 P.2d 820]), we have always taken pains to articulate the rule in the light of unconsciousness produced by voluntary intoxication. In *People v. Baker* (1954) 42 Cal.2d 550, 575 [268 P.2d 705], we said: "Unconsciousness is a complete, not a partial, defense to a criminal charge (Pen. Code, § 26, subd. 5), and, although voluntary intoxication may at times amount to unconsciousness, yet it can only have the effect of negating specific intent, the applicable code section being section 22 and not 26, subdivision 5. [Citations.]" We repeated this formulation in *People v. Conley* (1966) 64 Cal.2d 310, 323 [49 Cal.Rptr. 815, 411 P.2d 911]: "Defendant offered evidence of intoxication caused by alcohol and drugs to support his defense of unconsciousness. Unconsciousness is ordinarily a complete defense to a criminal charge. (Pen. Code, § 26, subd. Five.) If the state of unconsciousness is caused by voluntary intoxication, however, it is not a complete defense." (See also *People v. Graham* (1969) 71 Cal.2d 303, 316 [78 Cal.Rptr. 217, 455 P.2d 153].) Thus, as the above cases make clear, the provisions of section 22[12] cannot be circumvented by urging, as defendant does in the instant case, that we should concern ourselves only with the question whether the defendant was in a state of unconsciousness and not inquire as to whether such state was the product of the *voluntary* ingestion of drugs or alcohol. Such is not the law of this state.[13]

In sum, unconsciousness caused by voluntary intoxication is only a partial defense to a criminal charge—that is, it may serve to negate the specific intent or state of mind requisite to the offense. (*People v. Graham, supra*, 71 Cal.2d at p. 316; *People v. Baker, supra*, 42 Cal.2d at p. 575.) It follows, therefore, that unconsciousness caused by voluntary intoxication is *no* defense to a general intent crime—by definition a crime in which no specific intent is required. Assault with a deadly weapon is such a crime, and we have held that the requisite general intent therefor may not be

---

[12]Section 22 provides: "No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition. But whenever the actual existence of any particular purpose, motive, or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time, in determining the purpose, motive, or intent with which he committed the act."

[13]CALJIC No. 4.30 provides: "Where a person commits an act without being conscious thereof, such act is not criminal even though, if committed by a person who was conscious, it would be a crime. [¶] This rule of law applies only to cases of the unconsciousness of persons of sound mind, such as somnambulists or persons suffering from the delirium of fever, epilepsy, a blow on the head or the involuntary taking of drugs or intoxicating liquor, and other cases in which there is no functioning of the conscious mind."

negated through a showing of voluntary intoxication.[14] Thus, if there was substantial evidence to support the trial court's conclusion, defendant's argument that she was not guilty because of unconsciousness must fail.

In the instant case, the trial court found that "taking the case all round, it would have to be said that she had a sufficient consciousness of acting, as deranged as she was in other respects, to hold that the defense of unconsciousness was not available to her." It found that she was "intermittently aware of her actions" but that to the extent she was *not*, her condition was the "product of drug intoxication voluntarily induced." These findings are supported by substantial evidence—indeed they are not here challenged as to their sufficiency. The court's conclusion that to the extent defendant was aware of her acts she was not entitled to the defense of unconsciousness and its conjoined conclusion that to the extent she was *not* aware, she was still not entitled to it because such condition was produced by *voluntary* ingestion of drugs, are both in accordance with the legal principles set forth above. We conclude that defendant was properly found guilty as charged.

We turn to defendant's second contention which relates to the sanity phase of her trial. She claims that the court erred in finding her legally sane at the time of the offense on the basis that, although she did not know that what she was doing was wrong, her insanity was drug-induced and not of a settled and permanent nature. (See fn. 11, *ante*.) She argues that insanity, however caused, is a defense to a criminal charge.

It is fundamental to our system of jurisprudence that a person cannot be convicted for acts performed while insane. (*People* v. *Nash* (1959) 52 Cal.2d 36, 50-51 [338 P.2d 416]; Pen. Code, § 26, subd. Three.) Insanity, under the California M'Naughton test, denotes a mental condition which renders a person incapable of knowing or understanding the nature and quality of his act, or incapable of distinguishing right from wrong in relation to that act. (*People* v. *Wolff* (1964) 61 Cal.2d 795, 801 [40 Cal.Rptr. 271, 394 P.2d 959].) This is a factual question to be decided by the trier of fact. (*Id.* at p. 804.)

In this case the trial court found that defendant "was not capable of understanding that her act was wrong." We can only construe this

---

[14]This rule was reiterated in *People* v. *Hood* (1969) 1 Cal.3d 444, 452-459 [82 Cal.Rptr. 618, 462 P.2d 370], which applied the rule to a charge of assault with a deadly weapon upon a police officer (§ 245, subd. (b)). It also applies to the crime with which defendant is charged here, assault with a deadly weapon. (*People* v. *Parks* (1971) 4 Cal.3d 955, 960 [95 Cal.Rptr. 193, 485 P.2d 257]; *People* v. *Rocha* (1971) 3 Cal.3d 893, 896-900 [92 Cal.Rptr. 172, 479 P.2d 372]; *People* v. *Seals* (1970) 1 Cal.3d 574, 575 [82 Cal.Rptr. 873, 462 P.2d 993].)

finding to mean that defendant was insane under the aforementioned test. Despite this finding, the trial court adjudged defendant legally sane because her psychosis was "not of a settled and permanent nature, and, in addition, was produced by the voluntary ingestion of- hallucinatory drugs." In so ruling, the trial court misinterpreted the rules regarding the defense of insanity and committed prejudicial error.

As we have already stated, voluntary intoxication by itself is no defense to a crime of general intent such as assault with a deadly weapon. (See fn. 14, *ante*, and accompanying text.) However, we have repeatedly held that "when insanity is the result of long continued intoxication, it affects responsibility in the same way as insanity which has been produced by any other cause." (*People* v. *Griggs* (1941) 17 Cal.2d 621, 625 [110 P.2d 1031], italics added.) (See also *People* v. *Hower* (1907) 151 Cal. 638, 642-643 [91 P. 507]; *People* v. *Findley* (1901) 132 Cal. 301, 307 [64 P. 472]; *People* v. *Fellows* (1898) 122 Cal. 233, 240 [54 P. 830]; *People* v. *Travers* (1891) 88 Cal. 233, 239-240 [26 P. 88]. See generally La Fave & Scott, Handbook on Criminal Law (1972) at p. 348; Annot., 8 A.L.R.3d 1236, 1265; 1 Witkin, Cal. Crimes (1963) § 134, at p. 127; Clark & Marshall on Crimes (1958) § 6.05, at p. 374; Perkins on Criminal Law (1957) at p. 795; 1 Wharton's Criminal Law and Procedure (1957) § 46, at p. 112.)

Policy considerations support this distinction in treatment between voluntary intoxication resulting in unconsciousness and voluntary intoxication which causes insanity. The former encompasses those situations in which mental impairment does not extend beyond the period of intoxication. In such cases, our analysis in *People* v. *Hood, supra,* 1 Cal.3d at page 458, while phrased in terms of alcoholic intoxication, is entirely applicable: "A compelling consideration is the effect of alcohol on human behavior. A significant effect of alcohol is 'to distort judgment and relax the controls on aggressive and anti-social impulses. (Beck and Parker, *The Intoxicated Offender—A Problem of Responsibility* (1966), 44 Can. Bar Rev. 563, 570-573; Muelberger, *Medico-Legal Aspects of Alcohol Intoxication* (1956), 35 Mich.State Bar J. 36, 40-41.) Alcohol apparently has less effect on the ability to engage in simple goal-directed behavior, although it may impair the efficiency of that behavior. In other words, a drunk man is capable of forming an intent to do something simple, such as strike another, unless he is so drunk that he has reached the stage of unconsciousness. What he is not as capable as a sober man of doing is exercising judgment about the social consequences of his acts or controlling his impulses toward anti-social acts. He is more likely to act rashly and

impulsively and to be susceptible to passion and anger. It would therefore be anomalous to allow evidence of intoxication to relieve a man of responsibility for the crimes of assault with a deadly weapon or simple assault, which are so frequently committed in just such a manner."

When long-continued intoxication results in insanity, however, the mental disorder remains even after the effects of the drug or alcohol have worn off. The actor is "legally insane," and the traditional justifications for criminal punishment are inapplicable because of his inability to conform, intoxicated or not, to accepted social behavior. (See La Fave & Scott, *op. cit. supra,* at pp. 271-272.) He is, of course, subject to commitment in a mental institution. In the instant case, the trial court appears to have confused these separate rules. ■ The proper rule of law was early established in *People* v. *Travers, supra,* 88 Cal. at pp. 239-240: "[S]ettled insanity produced by a long-continued intoxication affects responsibility in the same way as insanity produced by any other cause. *But it must be 'settled insanity,' and not merely a temporary mental condition produced by recent use of intoxicating liquor."* (Italics added.) Thus it is immaterial that voluntary intoxication may have caused the insanity, as long as the insanity was of a settled nature and qualifies under the M'Naughton test as a defense.

■ The trial court carried this distinction too far, however, for it required proof that defendant's insanity was both settled and *permanent.*[15] Such a requirement violates the rule that "[t]emporary insanity as a defense to crime is as fully recognized by law as is permanent insanity." (*People* v. *Ford* (1902) 138 Cal. 140, 141-142 [70 P. 1075].) Thus, if defendant at the time of the offense was insane under the California M'Naughton test, it makes no difference whether the period of insanity lasted several

---

[15]This rule may have been misunderstood since in attempting to clearly distinguish between intoxication and insanity, we have in dicta previously implied that the defendant must be chronically or permanently insane. Thus, in *People* v. *Fellows, supra,* 122 Cal. at pp. 239-240, this court stated: "A sane man, therefore, who voluntarily drinks and becomes intoxicated is not excused because the result is to cloud his judgment, unbalance his reason, impair his perceptions, derange his normal faculties, and lead him to the commission of an act which in his sober senses he would have avoided. Upon the other hand, if one, by reason of long-continued indulgence in intoxicants, has reached that stage of *chronic* alcoholism where the brain is permanently diseased, where the victim is rendered incapable of distinguishing right from wrong, and where *permanent* general insanity has resulted, then, and. in such case, he is no more legally responsible for his acts than would be the man congenitally insane, or insane from violent injury to the brain." (Italics added.) Later cases have not mentioned the permanent nature of the insanity. (See, e.g., *People* v. *Griggs, supra,* 17 Cal.2d at p. 625.)

months, as in this case, or merely a period of hours. (See *People* v. *Donegan* (1939) 32 Cal.App.2d 716, 719 [90 P.2d 856].)[16]

We have reviewed the record in the instant case and we find substantial evidence to support the trial court's finding that defendant was psychotic at the time of the offense. This finding is amply supported by the testimony of psychiatrists. Substantial evidence also supports the finding that the psychosis was a product of voluntary ingestion of drugs. Finally, the trial court found that defendant "was not capable of understanding that her act was wrong," a finding supported by considerable psychiatric testimony that defendant could not distinguish right from wrong at the time of her offense.[17]

As already pointed out, if defendant was insane at the time of the offense, it is immaterial that her insanity resulted from repeated voluntary intoxication, as long as her insanity was of a settled nature. The trial court made a compound finding that defendant's insanity "was, not of a settled and permanent nature"; however, we have pointed out that insanity need not be permanent in order to establish a defense. The trial court also found that defendant suffered from a "temporary psychosis" that "was operating on this defendant from some time in November, at least through December and beyond the date of December 7." We hold that such a temporary psychosis which was not limited merely to periods of intoxication (see fn. 9, *ante*) and which rendered defendant insane under the M'Naughton test constitutes a settled insanity that is a complete defense to the offense here charged.

The judgment is reversed and the cause is remanded to the trial court with directions to enter a judgment of not guilty by reason of insanity and to take such further proceedings as are required by law.[18]

Wright, C. J., McComb, J., Tobriner; J., Burke, J., and Clark, J., concurred.

---

[16]Of course, the burden is on the defendant to establish by a preponderance of the evidence that the offense occurred during a period of insanity. (See *People* v. *Baker* (1954) 42 Cal.2d 550, 564 [268 P.2d 705], and cases cited therein.)

[17]We note that in the instant case defendant took mescaline the day before the offense. Defendant does not lose the defense of insanity because she may also have been intoxicated at the time of the offense. (La Fave & Scott, *op. cit. supra*, at p. 348; Clark and Marshall, *op. cit. supra*, § 6.09, at p. 388.)

[18]Penal Code section 1026 states in part: "If the verdict or finding be that the defendant was insane at the time the offense was committed, the court unless it shall appear to the court that the defendant has fully recovered his sanity shall direct that the defendant be confined in the state hospital for the criminal insane, or if there be no such state hospital, then that he be confined in some other state hospital for the

MOSK, J.—I concur in the judgment of the court and in the well-reasoned analysis of the opinion except for its reliance upon a doctrine we should, at long last, disavow as outmoded and unsupportable in either medical science or law: the ancient rule for determination of criminal responsibility. In four passages the opinion refers with approval to the M'Naughton test, in two of them describing the rule as "the California M'Naughton test." (*Ante*, pp. 574, 576, 577.) The opinion also speaks in terms of distinguishing right from wrong, and at the trial questions to the expert witnesses were so framed.

The implication that California does not adhere strictly to the traditional M'Naughton test, first adopted in England six score and ten years ago, is an accurate reflection of the current status of the law in this state. (*People* v. *Wolff* (1964) 61 Cal.2d 795 [40 Cal.Rptr. 271, 394 P.2d 959].) However, rather than to pay even cursory obeisance to the anachronistic theory commonly identified as the M'Naughton test, I would forthrightly abandon the rule and adapt the law in California to the best available alternative: the American Law Institute model code proposal.

In 1843 the M'Naughton rule declared, in substance, that a man was not a proper subject for hanging if he was unable to distinguish right from wrong conduct.[1] In practice this meant that because delirious and demented

insane. If, however, it shall appear to the court that the defendant has fully recovered his sanity such defendant shall be remanded to the custody of the sheriff until his sanity shall have been finally determined in the manner prescribed by law. . . ."

The trial court in this case found that defendant was not psychotic at the time it rendered judgment. However, since it erroneously found that defendant was legally sane at the time of the offense, it did not follow the procedures outlined above. Therefore, on remand it will be the duty of the trial court to decide whether "defendant has fully recovered [her] sanity." If it determines that she *has not* fully recovered her sanity, it should direct that she be confined in a state hospital as prescribed by section 1026. (See generally *In·re Franklin* (1972) 7 Cal.3d 126 [101 Cal.Rptr. 553, 496 P.2d 465].) If, on the other hand, it determines that defendant *has* in fact fully recovered her sanity, it should remand her to the custody of the sheriff until her sanity is finally determined "in the manner prescribed by law." We have interpreted the latter phrase to encompass proceedings of involuntary civil commitment which are now governed by Welfare and Institutions Code section 5000 et seq. (Lanterman-Petris-Short Act). (*In re Slayback* (1930) 209 Cal. 480, 484 [288 P. 769]; see also Witkin, Cal. Criminal Procedure (1963) § 507, at p. 514.) Under these procedures, a person may be detained up to 72 hours for evaluation, and if the person is deemed dangerous or refuses voluntary treatment, he may be certified for not more than 14 days of involuntary intensive treatment. (Welf. & Inst. Code, § 5250; see the more complete discussion of these procedures in *Thorn* v. *Superior Court* (1970) 1 Cal.3d 666, 668-672 [83 Cal.Rptr. 600, 464 P.2d 56].)

[1]"To what extent is a lunatic's spelling even of his own name to be deemed an authority?" asked Justice Frankfurter in his book, Of Law and Life and Other

individuals were incapable of appreciating and profiting by the punishment inflicted by the state, the cases were removed, after conviction, from the criminal process. Yet doubt was cast upon the M'Naughton rule soon after its promulgation. Professor Sherry quotes from an 1883 English source suggesting that "every judgment delivered since the year 1843 has been founded on an authority which deserves to be described as in many ways doubtful." (Sherry, *The Politics of Criminal Law Reform* (1973) 21 Am.J. Comp.L. 201, 211.) As Dr. Karl Menninger has written: "The psychiatrists of the day did not (sufficiently) dispute this pontifical 'decision,' and some have gone along with it ever since, despite its absurdity. It requires an incalculable degree of presumption to say whether *another* individual 'knows' right from wrong, especially when few of us could truly say . . . what our own degree of expertise is in this distinction. [¶] Trying to get around the absurdity of the M'Naghten criteria has invited the ingenuity of many lawyers, judges, and psychiatrists for a century." (Menninger, The Crime of Punishment (1966) p. 115.)

Efforts to "get around" the M'Naughton rule were undertaken in New Hampshire as long ago as 1870 (*State* v. *Pike*, 49 N.H. 399, 429), by Judge Bazelon in 1954 in *Durham* v. *United States*, 214 F.2d 862 [94 App.D.C. 228, 45 A.L.R.2d 1430],[2] by Chief Judge Biggs of the Third Circuit in *United States* v. *Currens* (1961) 290 F.2d 751, 774,[3] and by this court when in 1949 we adopted a significant variation of M'Naughton in *People* v. *Wells* (1949) 33 Cal.2d 330 [202 P.2d 53], a thoughtful concept developed by Justice Schauer, and further explicated in *People* v. *Gorshen* (1959) 51 Cal.2d 716 [336 P.2d 492].

Despite the innovative *Wells-Gorshen* approach, this court has persisted

Things (1965) page 3. He commented on the variorum of Daniel M'Naughten:
1. The original Gaelic—Mhicneachdain.
2. The defendant himself, signing a letter at the trial—M'Naughten.
3. The State Trials—Macnaughton.
4. Clark and Finnelly—M'Naghten.
5. Archbold—Macnaughton, Macnaughten or Macnaghten.
6. Stephen—Macnaughten or Macnaghten.
7. Halsbury—M'Naughton or M'Naghten.
8. 1930 Select Committee on Capital Punishment—McNaughten.
9. 1949 Royal Commission on Capital Punishment—M'Naghten.

[2]The *Durham* rule "is simply that an accused is not criminally responsible if his unlawful act was the product of mental disease or mental defect." The state of Maine has adopted *Durham*. (Me. Rev. Stats. Annot. (1964) pp. 15-104.)

[3]The *Currens* test is: "The jury must be satisfied that at the time of committing the prohibited act the defendant, as a result of mental disease or defect, lacked substantial capacity to conform his conduct to the requirements of the law which he is alleged to have violated." For a critical analysis of the case, see Diamond, *From M'Naughton to Currens and Beyond* (1962) 50 Cal.L.Rev. 189.

in paying lip service to M'Naughton. While in *People* v. *Henderson* (1963) 60 Cal.2d 482, 490 [35 Cal.Rptr. 77, 386 P.2d 677], Justice Traynor frankly conceded the *Wells-Gorshen* "purpose and effect are to ameliorate the law governing criminal responsibility prescribed by the M'Naughton rule," the following year this court in *People* v. *Wolff* (1964) 61 Cal.2d 795 [40 Cal.Rptr. 271, 394 P.2d 959], reaffirmed M'Naughton once again, declaring (at p. 803) that it has become " 'an integral part of the legislative scheme for the appraisal of criminal responsibility in California and any change therein should come from the Legislature.' " Indeed, said the *Wolff* court, "the entire problem is currently under consideraiton by that body." Nearly a decade later the problem still languishes before the Legislature, which now has presented to it a proposed revision of the entire Penal Code.

It is my thesis that, contrary to the concession in *Wolff* that M'Naughton is a part of the "legislative scheme" (*People* v. *Ryan* (1965) 140 Cal. App.2d 412, 425 [295 P.2d 496]), the ancient test has been solely a judicial product and therefore may, in deference to advances in medical and legal science, be judicially changed. Indeed, none of the statutory provisions relating to criminal responsibility have precisely followed the M'Naughton rule. (See, e.g., Pen. Code, § 26, subd. Three; Pen. Code, § 1016, subd. 6; Pen. Code, § 1367.) Nor does the proposed Penal Code now being considered by the Legislature speak in M'Naughton terms (see § 535 of the proposed Penal Code). Yet we· continue to proclaim that we abide by M'Naughton, despite the fact, as declared by Dr. Phillip Roche in The Criminal Mind (1958) page 176, that we "have reached a place where there is a consensus that the M'Naghten test of responsibility in the defense of insanity is no longer useful." Justice Frankfurter, testifying before the Royal Commission on Capital Punishment (1953), said the rules "are in large measure abandoned in practice and therefore I think the M'Naghten rules are in large measure shams. That is a strong word, but I think the M'Naghten rules are difficult for conscientious people . . . ."

I believe it is time that this court forthrightly jettison the M'Naughton rule and follow the lead of the several states that now adhere to the rule included in the Model Penal Code of the American Law Institute. The least we can do is to take a modest step that will be operative until such time as the Legislature finally acts upon the adoption of a new penal code and prescribes therein statutory requirements for criminal responsibility. We should not out of apathy or ennui continue, in the words of Justice Cardozo, to "mock ourselves with a definition that palters with reality" (Cardozo, Law and Literature (1931) p. 107), or adhere to a

test "which has almost no recognizable reality" (*United States* v. *Baldi* (3d Cir. 1951) 192 F.2d 540, 568).

Articulating a test of criminal responsibility is a problem of drafting a formula in such a way as to enable the judicial process to discriminate between those cases where a punitive-correctional disposition is necessary, and those in which a medical-custodial disposition will satisfy the needs of society. While a universally accepted result has proved elusive, an operational definition is not out of reach. Any test of criminal responsibility should be premised on the rationality of man and retain irrationality as a minimum criterion of insanity. Second, it should harmonize law and modern medical science, thus enabling the psychiatrist to contribute to the administration of justice unhampered by moral and legal abstractions. Third, the test should be stated in a manner readily understood by a jury of laymen. Fourth, any test should relieve from criminal responsibility all those with respect to whom the purposes of the penal law would not be satisfied by traditional imprisonment while at the same time making certain that the accountability of other persons for their actions is not undermined. (Lindman and McIntyre, The Mentally Disabled and the Law (1961) p. 336.)

The American Law Institute was organized in 1923 by a distinguished group of judges, lawyers, and legal scholars as a permanent organization devoted to the clarification and improvement of the law. It has devised formulations in the fields of criminal procedure, evidence, and its Uniform Commercial Code has been adopted in all but one state of the United States. Its Model Penal Code was finally completed in 1962 and subsequent thereto a number of states have adopted all or substantial parts of it (e.g., Illinois (1961), Minnesota (1963), New Mexico (1963), New York (1965), Pennsylvania (1965)).

Section 4.01 of the ALI Model Penal Code describes "mental disease or defect excluding responsibility" in the following terms: "(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law. [¶] (2) As used in this Article, the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct."

In the opinion of most thoughtful observers this proposed test, commonly known as the ALI formulation, is a significant improvement over

M'Naughton.[4] It substitutes "appreciate" for "know," thereby indicating that an offender must be emotionally as well as intellectually aware of the significance of his conduct. The test also uses the word "conform" instead of "control" which skillfully avoids any reference to such terms as "irresistible impulse" which have been as difficult of explanation as the M'Naughton test itself.

The ALI formulation has been adopted substantially in six states (Illinois, Vermont, Missouri, Massachusetts, Maryland, Wisconsin) and in most federal courts. Indeed, "No other circuit except the First continues to rely on the ancient M'Naghten rules" observed the Ninth Circuit, sitting en banc in *Wade* v. *United States* (9th Cir. 1970) 426 F.2d 64, 65, and adopting in substance the ALI test.[5] California has temporized with various devices, its notable contribution through *Wells-Gorshen* and their progeny being the concept of diminished capacity. I concede the merit in the diminished capacity theory, despite its frequently perplexing problems in application, but I cannot acquiesce in the continuing charade of deeming M'Naughton to be a sacred cow.

The majority opinion in this case would have become truly notable if it served as the last rites for the M'Naughton rule in California, invited the Legislature to adopt a substitute therefor whenever it considers penal code revision, and directed trial courts in the interim to adhere to the ALI formula.

---

[4]To mention just a sampling: Fingarette, The Meaning of Criminal Insanity (1972) page 242 ff.; Wechsler, Codification of Criminal Law in the United States (1968) page 24 ff.; Goldstein, The Insanity Defense (1967) page 86 ff.; Lindman & McIntyre, The Mentally Disabled and the Law, *supra*, page 336 ff. For a contrary view, see *State* v. *Lucas* (1959) 30 N.J. 37 [152 A.2d 50, 74] (Weintraub, C. J., concurring).

[5]*United States* v. *Freeman* (2d Cir. 1966) 357 F.2d 606; *United States* v. *Currens* (3d Cir. 1961) 290 F.2d 751; *United States* v. *Chandler* (4th Cir. 1968) 393 F.2d 920; *Blake* v. *United States* (5th Cir. 1969) 407 F.2d 908; *United States* v. *Smith* (6th Cir. 1968) 404 F.2d 720; *United States* v. *Shapiro* (7th Cir. 1967) 383 F.2d 680; *Pope* v. *United States* (8th Cir. 1967) 372 F.2d 710; *Wion* v. *United States* (10th Cir. 1963) 325 F.2d 420.