[No. F018841. Fifth Dist. Dec. 17, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
LAWRENCE G. RANDOLPH, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for partial publication. Portions deleted are noted by the insertion of the following symbol at the point of omission [[]].

## COUNSEL

Gregory M. Chappel, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, J. Robert Jibson and Janine R. Busch, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BUCKLEY, J.**—Defendant Lawrence G. Randolph appeals from conviction of violation of Penal Code section 459.[1] His sole contention is that the trial court erred in refusing to give CALJIC No. 4.02. We will affirm, finding insufficient evidence of "legal insanity" to warrant provision of that instruction.

### STATEMENT OF FACTS

On the evening of July 22, 1989, Terry Katzakian was awakened in his home by the sound of breaking glass. He observed someone walking from the front of his house to the front of the house next door, 1322 Princeton Avenue, Modesto, California. He later heard the sound of footsteps walking through broken glass. Katzakian telephoned the authorities to report his observations. In response, Officers Bashaw and Stockham were dispatched to the scene. They found a window next to the front door of the house had been "smashed out." The officers stepped through the hole and began searching the residence. They found several drawers opened and belongings strewn about. In the front bedroom, they found a plastic sack containing,

---

[1] All statutory references are to the Penal Code unless otherwise stated.

among other items, several coins, a telephone answering machine and a watch. They opened a closet door and found defendant sitting inside. He was breathing heavily, sweating profusely and had an extremely strong body odor. The officers found a flashlight and a pair of socks which bore an odor similar to that exuded by defendant on the closet floor.

After being removed from the closet, defendant immediately told the officers he had been given permission by a friend to sleep in the house and had been told to enter by the front window which had been broken three days before.

The owner of the home, Donald Mekeel, was on vacation from June 10, 1989, until September of the same year and the house was vacant during this period. Excepting his daughter, Dee Wing, he gave no one permission to enter the residence. Mekeel identified the items in the plastic bag as belonging to him.

Dee Wing cared for the house while her parents were on vacation. She drove by the house during the morning of July 21, 1989. She did not see anything unusual as she drove by that morning and did not notice any broken windows. She did not give anyone permission to enter or use the house while her parents were away.

On April 19, 1990, an information was filed charging defendant with violation of section 459 (residential burglary) with an allegation he had previously been convicted of a serious felony. Defendant ultimately entered a plea of not guilty by reason of insanity.

After jury trial, on October 14, 1990, defendant was found guilty of first degree burglary.

During the sanity phase of the trial, his mother, Tonia Copeland, testified that defendant had been diagnosed as a paranoid schizophrenic at age 16. Several medications to control the disease, including navane, cogentin and haldol, have been prescribed and defendant has been hospitalized on multiple occasions as a result of his mental illness. She also testified defendant began drinking to excess at approximately this same age.

Mrs. Copeland testified she saw her son on July 21, 1989. He was dirty and smelly and ran from her. In her opinion, he was suffering the effects of an overdose of his medications.

Dr. Macomber, a licensed clinical psychologist, testified as an expert for the defense. He concluded at the time of the crime defendant was acutely

mentally ill. This opinion was based upon the fact defendant told him he had swallowed "handfuls" of medications, including haldol, artane and cogentin and had drunk substantial amounts of beer on the day in question. It was his opinion the large quantity of artane and cogentin caused defendant to suffer a "blackout" making him unaware of his actions or the world around him.

Defendant testified that on July 22, 1989, he was feeling "bad" so he took all of his various medications, including medication he had "saved for years" and which no one knew he had. He specifically remembered taking amitriptyline, navane and cogentin.[2] He stated he had no memory of being inside the house on the evening in question.

Two psychologists testified on behalf of the prosecution. They both opined they did not believe defendant was suffering from a blackout at the time of the crime.

Defendant requested the trial court instruct the jury pursuant to CALJIC No. 4.02. The trial court refused, stating "the language does not fit the complaint of the defendant or the defense of the defendant."

Thereafter, the jury found defendant was sane at the time of the commission of the offense. Defendant was later sentenced to prison.

DISCUSSION

*The Legal Insanity Instruction*

██ As his sole contention on appeal, defendant argues the trial court's refusal to give CALJIC No. 4.02[3] constituted reversible error. The People counter by asserting the factual predicates necessary to support the giving of this instruction were not met and, even had giving of this instruction been warranted, the failure to give it was harmless. As we shall explain, the record does not contain substantial evidence supporting the conclusion that at the

---

[2]There is some discrepancy in the testimony as to what drugs were taken by defendant. Mrs. Copeland and defendant refer to the medication "navane" while Dr. Macomber alleges defendant took "artane." Moreover, Mrs. Copeland testified defendant was allergic to haldol while defendant makes no mention of any such allergy and Dr. Macomber lists it as one of the medications taken by defendant on July 22, 1989. However, they all agree he was prescribed and took cogentin.

[3]CALJIC No. 4.02 provides: "A person is legally insane if, by reason of mental disease or mental defect, either temporary or permanent, caused by the long continued use of [alcohol] [drugs] [narcotics], even after the effects of recent use of [alcohol] [drugs] [narcotics] have worn off, [he] [she] was incapable of knowing or understanding the nature and quality of [his] [her] act or incapable of distinguishing right from wrong at the time of the commission of the crime."

time of the offense defendant suffered from a mental disease or defect caused by consumption of drugs or alcohol which remained after the effects of recent use had worn off. Therefore, the trial court did not err by refusing to give the proffered instruction.

■ Upon proper request, a defendant has a right to an instruction pinpointing the theory of defense. (*People* v. *Wharton* (1991) 53 Cal.3d 522, 570 [280 Cal.Rptr. 631, 809 P.2d 290].) In determining whether a requested instruction must be given, the trial court must first evaluate the evidence to determine if the theory proffered by the defendant is supported by substantial evidence. Only if the theory is supported by substantial evidence is the refusal to give a requested instruction erroneous. (*People* v. *Flannel* (1979) 25 Cal.3d 668, 684-685 [160 Cal.Rptr. 84, 603 P.2d 1]; see also *People* v. *Lemus* (1988) 203 Cal.App.3d 470, 476 [249 Cal.Rptr. 897].) In making this determination, the trial court is not to weigh the credibility of the witnesses and any doubts as to the sufficiency of the evidence should be resolved in favor of the defendant. (*People* v. *Flannel, supra*, 25 Cal.3d at pp. 684-685.)

■ In *People* v. *Kelly* (1973) 10 Cal.3d 565, 574-576 [111 Cal.Rptr. 171, 516 P.2d 875], the Supreme Court, acknowledging that a person cannot be convicted for acts performed while insane, held that a person may be found legally insane because of long-term voluntary intoxication when the intoxication causes a mental disorder which remains after the effects of the intoxicant have worn off. While this mental disorder need not be permanent, it must be of a settled nature and must qualify under the M'Naughton test.[4] One "does not lose the defense of insanity because [he or she] may also have been intoxicated at the time of the offense." (*Id.* at p. 577, fn. 17.)

■ Defendant argues there was substantial evidence to support the determination he was "suffering from a settled insanity which continued even after the affects of the recent use of intoxicants had worn off" thus mandating the giving of CALJIC No. 4.02 as requested. In response, the People assert defendant did not introduce "substantial evidence of legal insanity, caused by brain damage by drugs, legal insanity which existed *apart* from any present drug use."

---

[4]"Insanity, under the California M'Naughton test, denotes a mental condition which renders a person incapable of knowing or understanding the nature and quality of his act, or incapable of distinguishing right from wrong in relation to that act. [Citation.] This is a factual question to be decided by the trier of fact." (*People* v. *Kelly, supra*, 10 Cal.3d 565, 574.)

The testimony of Dr. Macomber, Mrs. Copeland and defendant himself support the conclusion defendant is a paranoid schizophrenic[5] who was undoubtedly in a "blackout state" at the time of the commission of the crime, unaware of his actions or surroundings and unable to function in a rational manner. However, their testimony also clearly established that defendant's pitiful mental condition on the evening of his arrest was caused by an overdose of medications which, when taken in their correct dosages, help alleviate the symptoms of his schizophrenia and that, at the time of the commission of the offense, defendant was still suffering from the effects of the overdose and not from a settled insanity resulting from damage suffered as a result of his prior overdoses or the July 22, 1989, overdose.

As previously noted, Mrs. Copeland saw her son on July 21, 1989. She testified she felt he was overmedicated on that date because approximately four days before the incident, she had taken him to a doctor, who gave him "some medication." When she saw him at the bus stop, she knew he had been overmedicated, "Because I could look at him and tell him [sic] the way he laughed. I have another son like that, too that's how I know."

Mrs. Copeland testified that when defendant is on balanced medication and not drinking, he is "very kind and good-hearted." However, when he has been overmedicated or has been drinking, he goes into a mental state where he "[d]oesn't remember anything." She has seen defendant overmedicated on numerous occasions.

Dr. Macomber testified, "[A]t the time of the offense [defendant] was acutely mentally ill and that he was not aware of what he was doing and where he was and what was going on because of his mental illness, which was more than the normal mental illness because he had just swallowed handfuls of very powerful medication, Haldol and Artane and Cogentin, which had been prescribed, but stuffed them down and went to get thoroughly intoxicated, then he was arrested in this building he was in. Totally out of it mentally." He based this opinion on the fact defendant had told him he had an argument with his girlfriend and, because he was feeling bad, took substantially more than the prescribed amount of cogentin, artane and haldol, reasoning, " 'If my medicine helps me, it will really help me—it will really help me if I take it.' " Dr. Macomber testified "Artane and Cogentin are very, very dangerous. . . . If you take too much of them, you have a total black out." One will keep walking and talking, but "your mind is dead. It is

---

[5]Defendant does not allege his schizophrenia was caused by drug or alcohol use and he does not contend the schizophrenia alone rendered him legally insane at the time of the commission of the offense. He also does not argue CALJIC No. 4.02 should have been given merely because he takes medications to control the symptoms of the disease.

a blank. There is no memory at all of what happened during that period of time." He thought defendant was under the influence of cogentin and artane at the time he was inside the house. Significantly, he testified when defendant "is under control, taking the proper dosage of his medication and laying off alcohol," he is cognizant of his surroundings.

Neither Mrs. Copeland nor Dr. Macomber testified about any long-term effects prior repeated overdoses may have had on defendant's mental state. While defendant calls attention to testimony his intelligence quotient had dropped 40 points since childhood and Dr. Macomber's statement that this points to "brain damage," there is no indication this reduction in measurable intelligence was caused by the overdoses of medication or whether it was a product of his schizophrenia. Moreover, there was no testimony a reduction in I.Q. correlates with or is connected to loss of sanity. Certainly, individuals with differing intelligence quotients may be equally "sane" under the law.

Defendant asserts Dr. Macomber testified that overdosed patients could remain in a blackout state for very long periods of time "which is the result of the damage done to their brain[s]." This is inaccurate. Dr. Macomber never specifically testified an overdose of cogentin and arcane causes brain damage continuing beyond the period during which the drugs remain in an individual's system.[6] He simply testified an overdose may cause one to lose his or her memory for a period of weeks. In fact, Dr. Macomber offered no testimony as to the long-term effects on an individual after an overdose of artane and cogentin and never directly testified such an overdose can result in continuing psychosis. His testimony was confined to the effects one suffers during the period one is "under the influence" of these medications.

Defendant argues Mrs. Copeland's testimony that he still appeared disoriented when she visited him one week after his arrest demonstrates he suffered a continuing psychosis as a result of the overdose which continued after the *immediate effects* of the overdose had subsided. However, trial testimony does not support this conclusion. As defendant notes, Dr. Macomber testified the blackout period brought on by an overdose can last for weeks. Moreover, Mrs. Copeland testified she had contacted "the hospital" after she saw defendant at the bus station and "I let them know this medicine is not going away if it is still in his system. They told me it would eventually go away." The clear inference of this testimony is that the immediate effects of these medications may persist for a substantial period.

Defendant also points to the fact Officer Bashaw testified he was not sleepy and did not smell of alcohol when he was arrested to demonstrate he

---

[6]There was no specific testimony as to exactly how long it takes a given individual to metabolize and eliminate these medications from his or her system.

was not suffering from the effects of medication and alcohol at the time of the commission of the crime but was suffering from a settled mental defect brought about as a result of the overdose. However, the officers testified defendant was breathing rapidly and sweating profusely when arrested. Dr. Macomber testified one could be sweating and breathing rapidly if haldol and alcohol were taken in excess and in combination because one would be "in a state of severe distress from medication." He also testified he believed defendant was under the influence of his medications during the period he was inside the house. Moreover, defendant himself testified he had taken all of his medications on the date he was arrested.

Finally, defendant attempts to analogize his situation to that presented in *People* v. *Kelly*, *supra*, 10 Cal.3d 565. In *Kelly*, defendant stabbed her mother after a two-month period of extensive drug abuse. However, in *Kelly*, the Supreme Court specifically noted, "The trial court heard considerable testimony that defendant was not acting simply as a person who, after ingesting drugs or alcohol is unable to perceive reality and reason properly. Rather, the drug abuse was deemed the indirect cause of a legitimate, temporary psychosis that would remain even when defendant was temporarily off drugs." (10 Cal.3d at p. 570.) The court also wrote, "It is important to note that defendant's psychosis was not merely temporarily related to the period in which she was under the influence of drugs." The court pointed to expert testimony that defendant was psychotic for " 'a period of some nine or ten months' " and that her psychosis, although drug-induced, "would continue even after she went off the drug." (*Id.* at p. 570, fn. 9.) The court also referred to expert testimony that defendant would have been psychotic as a result of her prolonged drug abuse even if she had ingested no drugs the evening before the offense. (*Id.* at p. 569, fn. 6.)

As is apparent from the foregoing, *Kelly*, *supra*, 10 Cal.3d 565 is not analogous to the instant case. Here, no one testified defendant's *prior* overdoses of medication caused a mental condition or psychosis rendering him legally insane at the time of the commission of the offense nor did anyone specifically declare the July 22, 1989, overdose resulted in continuing psychosis (other than the schizophrenia itself). Moreover, there was also no testimony that defendant would have suffered a blackout on July 22, 1989, even had he not taken cogentin and artane on that date. Rather, both Mrs. Copeland and Dr. Macomber testified that when defendant took his medications in the correct dosages he was aware of his surroundings and was not in a blackout state.

In conclusion, the record is devoid of substantial evidence to support a finding that defendant's July 22, 1989, overdose caused a continuing state of

psychosis, temporary or permanent, which persisted after the immediate effects of overdose wore off. The record is equally devoid of evidence to support a finding that defendant's past overdoses resulted in a psychosis from which he was suffering at the time he committed the offense. The People are correct in asserting there was no evidence of legal insanity "which existed apart from any present drug use."

[[CALJIC No. 2.90]]*

. . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is affirmed.

Vartabedian, Acting P. J., and Harris, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 16, 1994.

---

*See footnote, *ante*, page 1836.