Filed 8/22/16  P. v. Calderon CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>　　v.<br><br>JOE MICHAEL CALDERON,<br><br>　　　　Defendant and Appellant. | B263011<br><br>(Los Angeles County<br>Super. Ct. No. PAO75471) |

APPEAL from a judgment of the Superior Court of the County of Los Angeles, David B. Gelfound, Judge.  Affirmed, as modified, and remanded with instructions.

Cannon & Harris, Donna L. Harris, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Shawn McGahey Webb, Supervising Deputy Attorney General and Ilana Herscovitz, Deputy Attorney General, for Plaintiff and Respondent.

## INTRODUCTION

A jury found defendant and appellant Joe Calderon (defendant) guilty of murder and assault with a deadly weapon. On appeal, defendant contends that the trial court committed a prejudicial error when it refused to instruct the jury on unconsciousness and heat of passion defenses to the murder charge. Defendant also contends that he was entitled to one additional day of actual custody credit.

We hold that the claimed error in refusing to instruct on the unconsciousness defense was harmless and that there was insufficient evidence to support an instruction on the heat of passion defense. We also agree that defendant was entitled to one additional day of custody credit and therefore modify the judgment to reflect the correct number of days of custody credit to which defendant was entitled. In all other respects, the judgment is affirmed.

## FACTUAL BACKGROUND

### A. Prosecution's Case

#### 1. Defendant's Relationship with his Family

Jose and Maria Calderon had three children: Joe, Leticia, and Jaime. Defendant was their grandson, the son of their oldest son Joe. Defendant came to live with Jose and Maria when he was five years old.[1] Defendant's grandmother loved him like a son. Defendant's grandparents received money from the government for his support, part of which they used to pay him an allowance and the rest they deposited in a bank account

---

[1] Defendant's father Joe had been in and out of prison, and defendant's grandmother did not want defendant to end up like his father.

for his benefit.  In addition to the bank account, defendant's grandmother kept household cash to run the household in a locked dresser in her bedroom or in the closet.**2**

Leticia, who was 21 years older than defendant, and Jaime, who was almost 20 years older, were still living at their parents' home when defendant came to live with them.  Leticia and Jaime had a good relationship with defendant and they characterized him as a "pretty good kid" growing up.

During defendant's senior year in high school, however, he began to change.  He was not doing well in school and became more focused on "hanging out with friends" and "having fun . . . , going out."  Defendant eventually dropped out of school before graduating.  He also began using drugs and alcohol.  When defendant turned 18, he was given access to the bank account his grandparents had established for his benefit, and he soon spent all the money in the account.

Defendant's grandparents did not want defendant going out with his friends every day and staying out late.  Because of defendant's ongoing conflicts with his grandparents, he went to live with Leticia and her family in January 2011.  Leticia allowed defendant to stay with her family on the condition that he work and finish high school.  By November 2011, however, defendant moved out of Leticia's house because he was not working or going to school and had invited friends to Leticia's house without her permission.

Defendant's grandparents allowed him to move back in with them, but on the condition that he return to school and find employment.  But defendant soon began arguing with his grandmother.  His grandfather recalled that one such argument was about defendant being unemployed and in need of money.  Defendant's grandfather also recalled an incident during which defendant raised his arm as if he was about to hit his grandfather.  Leticia recalled an argument between defendant and his grandmother about him coming home late at night; and Jaime recalled an argument during which defendant's grandmother advised him to stop using drugs and associating with people who were a bad

---

**2**     A day or two after his wife's murder, Jose checked his residence and discovered that the money his wife kept in the locked drawer was missing

3

influence on him. The grandparents' next door neighbors also heard arguments coming from the grandparents' house.

### 2. *Day Before the Murder*

On December 15, 2012, Leticia went to visit her parents around noon. While there, she observed defendant acting "a little weird." His movements were not coordinated and he was saying "random things." Among other things, defendant said, "they made me gay." His behavior was unusual and unlike anything Leticia had observed before. When Leticia asked defendant how he was doing, he mumbled something and then asked her to take him to church, which Leticia thought was an unusual request. Leticia told defendant to get dressed and she would take him to church. But defendant had trouble dressing and, once he was dressed, Leticia had to tell him to keep his clothes on. Leticia drove defendant to church and went inside with him. As they stood by a statue of Saint Jude, defendant confided in Leticia his desire to change. Leticia told him if he wanted to change, he should ask Saint Jude. Defendant said that he wanted to stop doing drugs, hugged Leticia, and told her he loved her. Defendant then dropped to the floor, started crying, stood up again, and "[held] on to [the statue of] Saint Jude and [was] whispering and praying something."

Defendant and Leticia left church and she drove him to her husband's work because she suspected defendant was under the influence of drugs. After Leticia's husband spoke to defendant for a few minutes, he told Leticia, "'Yeah, he's under the influence. He's done crack.'"

During the drive back to his grandmother's house, defendant was not "saying a whole lot." At the house, defendant ate half a sandwich, but seemed disoriented. Although defendant stood up from the table and told Leticia he was not going to finish the sandwich, he nevertheless sat back down and ate more. Defendant was not angry or acting violent.

4

Leticia left around 4:00 p.m.  Later that evening, she spoke to defendant by telephone and he again told her he wanted to change.  At the end of the short conversation, they each said, "'I love you.'"

That evening, defendant's grandfather observed him acting strangely.  Defendant and his grandparents were watching television in the living room.  Defendant kept getting up from the sofa and going to the window.  Defendant told his grandfather there were people outside, but when his grandfather checked, there was no one there.  Defendant asked his grandfather to take him to the hospital, but did not respond when his grandfather asked why.   Defendant's grandfather thought defendant was on drugs.  Defendant's condition was the worst his grandfather had seen.  Defendant and his grandparents went to sleep that night between 8:00 p.m. and 9:00 p.m.

### 3.    *Morning of the Murder*

When defendant's grandfather left for work the next morning around 4:00 a.m., his wife and defendant were asleep in their rooms.  Later that morning, defendant's grandmother telephoned Leticia and asked her to send her husband over because defendant was "acting strange or crazy and breaking things," including a mirror.  Leticia told her mother that her husband was not home, but that she would come over.  The last sound Leticia heard during the conversation was a scream.

Leticia arrived at her parents' home approximately seven minutes later.  When she arrived, she saw defendant, pacing and bloody, inside the gate to the driveway.  Leticia exited her car and asked defendant where his grandmother was, but defendant did not respond.   He had "a blank look on his face."

Leticia went through the front door of the house and observed that the interior had been ransacked.  She moved through the living room toward the kitchen and found her mother nonresponsive on the kitchen floor.  She saw blood on the left side of her mother's head.  The faucet was running, so Leticia turned it off and left the house.  She approached defendant, who was still pacing outside, and said, "'Mijo, what did you do?'"  Defendant did not respond and, instead, picked up a metal pole as if he was going to

5

throw it at Leticia. She ran to her car, drove off, called 911, and went to pick up her husband. She and her husband then returned to the house and spoke to the police, who had already responded to the scene.

### 4. Defendant's Arrest

City of Los Angeles Police Officers Sandoval and Harris received a radio call about an assault and responded to the scene. When they arrived at the grandparents' house, Officer Sandoval observed defendant standing at the end of the driveway holding on to a chain link gate. Defendant appeared calm. Defendant looked at the officers, and Officer Sandoval noticed that defendant had blood on his hands that was wet. Officer Sandoval gave defendant a command to lay on the ground with his arms to his side. Defendant did not respond to the first command, requiring Officer Sandoval to repeat it before defendant complied. Defendant did everything Officer Sandoval asked him to do, but he reacted "slower than normal." Defendant, however, was nonresponsive to questioning. Officer Sandoval concluded that defendant may have been under the influence. Officer Harris handcuffed defendant and took him into custody.

### 5. The Investigation

After taking defendant into custody, the responding officers entered the residence and found defendant's grandmother (the victim) lying face up on the kitchen floor and bleeding from multiple locations on her face and neck. The police obtained a search warrant, searched the residence, and photographed evidence. In the kitchen, there was pooled blood on the floor around the victim's head and blood stains "all over the cabinets[,] . . . the stove," and the refrigerator. In a drawer, the officers also found blood stains on a butter knife, a rolling pin, a fork, and an utensil tray. On the edge of one wall, there were fresh indentations and blood spatter, "as if something hit the wall and cast off blood." On a loveseat, there was an empty drawer with a locking mechanism that had blood stains on the front of it. There was also a butter knife on the loveseat. The mirror

6

on the medicine cabinet in the bathroom was broken and there was broken glass in the sink. A dented and bloodstained metal flower pot and bloodstained pieces of mail were scattered across the floor. The police did not find any cash in the residence.

A City of Los Angeles Police Department criminologist received and tested blood samples from: a knife blade tip; a knife handle; a barbecue fork; defendant's forearm; defendant's fingernails; and a drawer. The blood on the knife tip matched defendant's DNA profile. The blood on the knife handle had DNA from defendant and the victim. The blood on the barbecue fork matched the victim's DNA profile. The blood on defendant's forearm and fingernails contained a mixture of DNA from defendant and the victim. And the blood on the drawer contained a mixture of DNA from defendant and the victim.

A deputy medical examiner for the Los Angeles County Coroner performed an autopsy on the victim. He observed and diagramed multiple injuries to her body, two of which were serious enough to be fatal. The first fatal wound was on the left side of the victim's neck. She sustained four rows of puncture wounds, each row containing three cut wounds from a three-pronged object. One of those puncture wounds severed the jugular vein and was fatal. The wounds to the left side of the victim's neck also caused a large pooling of blood that compressed her airway.

The other fatal wound was to the victim's head. Blunt force trauma caused blood to pool in the space between the victim's scalp and skull and caused a "subarachnoid" hemorrhage or bleeding from the web of blood vessels that surround the brain. The blood around the brain caused swelling of the brain that was also fatal.

In addition to the fatal wounds, the victim's left jaw was broken and displaced from an impact of "significant force." The victim also had two puncture wounds to the right side of her chest and bruising on her chest, arm, and hand. And the victim had three to four puncture wounds to her cheek and the left side of her head.

7

### B.     Defense Case

Juan Alvarez, Leticia's husband, saw defendant at work on the day before the murder. Leticia brought defendant there to speak with Juan because she believed defendant "wasn't well." When Juan saw defendant, he was acting unusual, "looking everywhere from one side to the other" while Juan talked to him. Juan asked defendant if he was on drugs, and defendant responded that he had taken "crystal." Defendant did not tell Juan when he had taken the drugs or how he had taken them.

Forensic psychologist Haig Kojian was appointed by the trial court to evaluate defendant. Based on the materials Kojian reviewed, he determined that defendant had a history of drug use, including testing positive for methamphetamine and marijuana on the day of the murder. Kojian concluded that defendant's methamphetamine use affected his behavior. According to Kojian, methamphetamine produces an excess of dopamine in the brain and causes psychotic-like symptoms. Psychosis is a "break in reality" that causes hallucinations, delusions, paranoia, and bizarre speech and actions. Methamphetamine use can cause brain damage from which it can take up to two years to recover.

Based on Kojian's evaluation, defendant was demonstrating symptoms of methamphetamine-induced psychosis prior to the murder. The witness and police reports about defendant's behavior were consistent with an excessive amount of dopamine in the brain. Defendant's comment about being turned gay was also consistent with methamphetamine use.

According to Kojian, defendant's competency evaluation "showed that at the time of that evaluation he was . . . acting strangely and had broken something in the house on the day of the incident, . . . there were statements that he appeared to be spaced out, that he had made a statement about his sexual orientation and wanted to change, and that he was . . . 'paranoid, pacing back and forth and looking outside.' Again, it stated that he wanted to go to the hospital, and it appeared that he was experiencing hallucinations of water on the walls about six months before this [incident]."

The witness interviews that Kojian reviewed showed "[t]hat he was experiencing problems with a grandparent . . . because he was known to use drugs and that he was known to become aggressive verbally . . . when he was under the influence. He was known to drink quite a bit. And . . . the alleged victim in this case had decided that she wasn't going to support him financially any longer. [His] girlfriend had indicated that he was known to experience anger control or other aggressive problems, and he had indicated he believed his grandparents were too strict. [They] wouldn't allow him to bring friends over, [and] he never wanted to be home with the grandparents because they [would] not allow him to have friends over and so forth, but . . . he was considered to be a very nice individual. [Defendant] and the girlfriend were smoking and drinking on a regular basis quite a lot. [S]he thought [it] was weird that he was repeating things over and over which he found to be sentimental. . . . But . . . he was very caring, but tended to be repetitive in his statements. [¶] According to the grandfather he was asking for money, lying about going to school or work. He would bring people to the home, and [his grandparents] were becoming more strict with him. He would yell and scream at [his] grandmother and cause the grandparents to be afraid. And [he] was basically rude and unruly, but [did not resort to] physical violence . . . . But he was noted to be paranoid [and] agitated . . . . And it was believed that this was . . . 'drug induced.' And it [was] reported, there was nobody outside, but he was . . . 'freaking out.' [¶] Apparently [defendant] had recently began to associate with certain individuals, and it was believed he was using drugs other than marijuana, and [his] grandfather believed his condition was . . . 'the worst they had ever seen'. . . . He was staring, looking at the window and acting in a bizarre fashion on the day of the [incident]."

The county jail records that Kojian reviewed "showed [defendant] attempted to commit suicide while in custody. [Defendant] . . . noted that 'he killed the only person he loved because he was possessed by the devil.' One note show[ed] he jumped off his bed and landed on his head. Another note indicate[d] he reported to custody staff [that] he need[ed] to finish the job, meaning kill himself. Other records show[ed] that he was quite distressed. Apparently, four days after the arrest he tried to poke his eyes out. He

9

had to be transferred to County USC Hospital by ambulance. He was placed on a W.I.C. 5150 hold. He was given Haldol, Ativan, Clonazepam, Prozac. He had to be placed in . . . four-point leather restraints. About a week or so later, when asked if he recalled . . . trying to harm himself, he indicated, 'I was on meth'. . . . [¶] [A] number of weeks later he indicated he was possessed by something evil at the time. Another note show[ed] he was treated with Risperdal, which is an antipsychotic. Another note show[ed] he was reported hallucinating, feeling possessed by the devil. One note showed his presentation to be bizarre, his thought content was bizarre, [and he was] considered to be religiously preoccupied. He presented with a 'thought disorder.' . . . And [he presented] affective symptoms, meaning he could have been compromised as well as psychotic or depressed or perhaps manic. [¶] He was given a provisional diagnosis of psychotic disorder N.O.S. . . . So five days after the arrest, jail mental health people decided that he was mentally compromised to the extent they believed he warranted a diagnosis of psychotic disorder N.O.S., meaning not otherwise specified. [¶] Another note show[ed] he was placed on Klonopin, which is Clonazepam. Another note show[ed] he was confused. Another note show[ed] he was given a diagnosis of mood disorder N.O.S. and amphetamines abuse. And then finally another note show[ed] he was complaining of experiencing auditory hallucinations . . . ."

Dr. Kojian performed a cognitive status evaluation and a personality assessment inventory on defendant. He determined that there was no indication that defendant had brain damage. He further determined that defendant was not exhibiting signs of violence, aggression, or antisocial behavior.

On cross-examination concerning his notes of his conversations with defendant, Kojian recalled that defendant told him that, on the night before the murder, defendant's grandmother was trying to get him to sleep and became frustrated because he was not acting normally. The next morning, defendant heard his grandfather leave for work. Defendant planned to have his girlfriend come to the house after his grandmother left for church. Defendant went to the bathroom and hit the mirror with his fist. At that point in the conversation with Kojian, defendant said, "'That's all I'm going to say.'"

10

Nevertheless, defendant then told Kojian that his grandmother came to the bathroom and was very frustrated and "fed up" with him. Defendant then heard his grandmother talking on the telephone with Leticia and, according to defendant, that is when the incident occurred. When Kojian was asked whether defendant recalled the "actual incident itself," Kojian said, "Seems to be."

## PROCEDURAL BACKGROUND

In an information, the Los Angeles County District Attorney charged defendant in count 1 with murder in violation of Penal Code section 187, subdivision (a)[3] and in count 2 with assault with a deadly weapon in violation of section 245, subdivision (a)(1). Defendant pleaded not guilty.

The jury found defendant guilty on both counts. As to the murder charge, the jury found defendant guilty of first degree murder, not the lesser included offense of second degree murder. The trial court sentenced defendant to a term of 25 years to life on count 1 and a consecutive three-year term on count 2. The trial court awarded defendant 827 days of actual custody credit.

## DISCUSSION

### A.     Involuntary Manslaughter Based on Voluntary Intoxication Causing Unconsciousness

#### 1.     Background

During the jury instruction conference, the trial court indicated that it intended to instruct the jury concerning voluntary intoxication using CALCRIM No. 625.[4]

---

[3]     All further statutory references are to the Penal Code unless otherwise indicated.

[4]     The version of CALCRIM No. 625 given by the trial court provided: "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way.

11

Defendant's trial counsel agreed, but requested that the trial court also instruct the jury on voluntary intoxication causing unconsciousness using CALCRIM No. 626. That instruction provides: "Voluntary intoxication may cause a person to be unconscious of his or her actions. A very intoxicated person may still be capable of physical movement but may not be aware of his or her actions or the nature of those actions. [¶] A person is *voluntarily intoxicated* if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect. [¶] When a person voluntarily causes his or her own intoxication to the point of unconsciousness, the person assumes the risk that while unconscious he or she will commit acts inherently dangerous to human life. If someone dies as a result of the actions of a person who was unconscious due to voluntary intoxication, then the killing is involuntary manslaughter. [¶] Involuntary manslaughter has been proved if you find beyond a reasonable doubt that: [¶] 1. The defendant killed without legal justification or excuse; [¶] 2. The defendant did not act with the intent to kill; [¶] 3. The defendant did not act with a conscious disregard for human life; AND [¶] 4. As a result of voluntary intoxication, the defendant was not conscious of (his/her) actions or the nature of those actions. [¶] The People have the burden of proving beyond a reasonable doubt that the defendant was not unconscious. If the People have not met this burden, you must find the defendant not guilty of (murder/ [or] voluntary manslaughter)." (CALCRIM No. 626.)

The prosecutor objected to the instruction and, when trial court questioned whether there was sufficient evidence of unconsciousness, the prosecutor emphasized Kojian's testimony that defendant was able to recall the events leading up to the murder. Defendant's counsel relied upon Leticia's testimony about her observations of

---

You may consider that evidence only in deciding whether the defendant acted with an intent to kill, or the defendant acted with deliberation and premeditation. [¶] A person is *voluntarily intoxicated* if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect. [¶] You may not consider evidence of voluntary intoxication for any other purpose."

12

defendant's demeanor when she arrived at the scene and the responding officers' testimony that defendant had to be given repeated commands before he complied. The trial court concluded that: "In this case, we're not dealing with a situation where a person had an epileptic seizure or involuntary intoxication where he is drugged or has a blackout. Based on the evidence we have . . . [defendant] used meth, [and] he ha[d] recall of the incident. He indicated to the doctor that he didn't want to talk about it. The fact that the officer had to ask him twice to comply doesn't prove that he was unconscious at the time of the incident. [¶] Therefore, over the defense objection, the court is not going to give [CALCRIM No.] 626 based on [the] insufficiency of the evidence of unconsciousness." The trial court nevertheless instructed the jury with a version of CALCRIM No. 625, the voluntary intoxication defense to murder.

### 2. Legal Principles

Defendant contends that the trial court erred when it refused to instruct the jury on the lesser included offense of involuntary manslaughter based on voluntary intoxication causing unconsciousness. According to defendant, there was sufficient evidence to support a reasonable inference that defendant was unconscious at the time of the murder due to methamphetamine intoxication.

"Voluntary and involuntary manslaughter are lesser included offenses of murder. (*People v. Breverman* (1998) 19 Cal.4th 142, 154 [77 Cal.Rptr.2d 870, 960 P.2d 1094] [voluntary manslaughter]; *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1145 [124 Cal.Rptr.2d 373, 52 P.3d 572] [involuntary manslaughter].) An instruction on a lesser included offense must be given only if there is substantial evidence from which a jury could reasonably conclude that the defendant committed the lesser, uncharged offense but not the greater, charged offense. (*People v. Breverman, supra*, at pp. 154, 162.) '[E]very lesser included offense, or theory thereof, which is supported by the evidence must be presented to the jury.' (*Id.* at p. 155.)" (*People v. Thomas* (2012) 53 Cal.4th 771, 813.)

"When a person renders himself or herself unconscious through voluntary intoxication and kills in that state, the killing is attributed to his or her negligence in self-

13

intoxicating to that point, and is treated as involuntary manslaughter. 'Unconsciousness is ordinarily a complete defense to a charge of criminal homicide. (Pen. Code, § 26, subd. [Four].) If the state of unconsciousness results from intoxication voluntarily induced, however, it is not a complete defense. (Pen. Code, § 22) . . . [I]f the intoxication is voluntarily induced, it can never excuse homicide. [Citation.] Thus, the requisite element of criminal negligence is deemed to exist irrespective of unconsciousness, and a defendant stands guilty of involuntary manslaughter if he voluntarily procured his own intoxication.' (*People v. Graham* (1969) 71 Cal.2d 303, 316 [78 Cal.Rptr. 217, 455 P.2d 153].) Unconsciousness for this purpose need not mean that the actor lies still and unresponsive: section 26 describes as '[in]capable of committing crimes . . . [P] . . . [P] . . . [p]ersons who *committed the act* . . . without being conscious thereof.' (Italics added.) Thus unconsciousness '"can exist . . . where the subject physically acts in fact but is not, at the time, conscious of acting."' (*People v. Kelly* (1973) 10 Cal.3d 565, 572 [111 Cal.Rptr. 171, 516 P.2d 875]; *People v. Heffington* (1973) 32 Cal.App.3d 1, 9 [107 Cal.Rptr. 859].)" (*People v. Ochoa* (1998) 19 Cal.4th 353, 423.)

"A trial court must instruct on a lesser included offense if substantial evidence exists indicating that the defendant is guilty only of the lesser offense. (*People v. Breverman, supra,* 19 Cal.4th 142, 162.) '"Substantial evidence" in this context is "'evidence from which a jury composed of reasonable [persons] could . . . conclude[]'" that the lesser offense, but not the greater, was committed. [Citations.]' (*Ibid*.)" (*People v. Manriquez* (2005) 37 Cal.4th 547, 584.)


> ### 3. *Analysis*

We do not need to determine whether there was substantial evidence in support of defendant's unconsciousness defense because, even assuming there was such evidence, the trial court's failure to instruct on that defense was not prejudicial. Under California's standard of harmless error, a failure to instruct on a lesser included offense does not require reversal "unless an examination of the entire record establishes a reasonable

probability that the error affected the outcome." (*People v. Thomas, supra,* 53 Cal.4th at p. 814.)

Although the trial court refused to instruct on the unconsciousness defense to murder, it instructed the jury on the voluntary intoxication defense to murder using CALCRIM No. 625, which defense, if accepted by the jury, would have resulted in a conviction on the lesser included offense of second degree murder. And, defense counsel used that instruction to argue that defendant's intoxication prevented him from forming the express intent to kill, which intent was required for first degree murder. Nevertheless, the jury rejected the voluntary intoxication defense and found defendant guilty of first degree murder, meaning the jury found that defendant not only harbored the express intent to kill his grandmother, but also that he premeditated and deliberated the murder.

The unconsciousness defense instruction does not provide an additional substantive standard for negating intent, but rather a means of negating defendant's intent to kill that would lead to a verdict on the lesser included offense of involuntary manslaughter. Thus, because the jury rejected the voluntary intoxication defense to murder, there is no reasonable probability that defendant would have obtained a more favorable outcome if the trial court had instructed on the unconsciousness defense. (See, *People v. Boyer* (2006) 38 Cal.4th 412, 475.)

Defendant contends that we must apply the federal constitutional harmless error standard from *Chapman v. California* (1967) 386 U.S. 18, 24—i.e., the prosecution must show that the error was harmless beyond a reasonable doubt—although he acknowledges that under *People v. Beltran* (2013) 56 Cal.4th 935, 955, a nonconstitutional claim of misdirection of the jury is reviewed under the California harmless error standard as established in *People v. Watson* (1956) 46 Cal.2d 818, 836. Even if the *Chapman* standard applied, given the jury's rejection of the voluntary intoxication defense, we would conclude that any error in failing to instruct the jury on the unconsciousness defense was harmless beyond a reasonable doubt because there is no doubt that the jury would also have rejected the unconsciousness defense.

15

**B.** **Voluntary Manslaughter Based on Heat of Passion**

Defendant contends that the trial court erred by refusing to instruct the jury on voluntary manslaughter based on heat of passion using CALCRIM NO. 570. According to defendant, there was sufficient evidence to support an inference that, following a long period of tension between defendant and his grandmother, defendant's grandmother did or said something on the morning of the murder that provoked him to violently attack her with a barbecue fork.

*1.* *Background*

During the jury instruction conference, defendant's counsel requested that the trial court instruct the jury on voluntary manslaughter due to heat of passion using CALCRIM No. 570. That instruction provides: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. [¶] The defendant killed someone because of a sudden quarrel or in the heat of passion if: [¶] 1. The defendant was provoked; [¶] 2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured (his/her) reasoning or judgment; AND [¶] 3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment. [¶] Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection. [¶] In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it. While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time. [¶] It is not enough that the defendant simply was provoked. The defendant is not allowed to set up (his/her) own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and

16

knowing the same facts, would have reacted from passion rather than from judgment. [¶] [If enough time passed between the provocation and the killing for a person of average disposition to 'cool off' and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis.] [¶] The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder." (CALCRIM No. 570.)

When the trial court asked defendant's counsel for her factual theory in support of the requested instruction, she responded that there was evidence showing that defendant was "acting irrational and under the influence of intense emotion." The trial court refused to give the instruction, explaining: "So if we look at the facts of this case, there was some indication that at some point the grandmother was upset that the defendant wasn't doing what he was supposed to do, but there is no evidence of any provocation that would justify giving the heat of passion instruction. There is no provocation by the victim in this case. There's—looking at the objective reasonable standard . . .—I don't believe there is any evidence that would justify this instruction. So over the defense objection the court will not be giving this instruction."

### 2. *Legal Principles*

As explained, "[a] trial court has a sua sponte duty to instruct on lesser included offenses, such as voluntary manslaughter, that find 'substantial support in the evidence.' (*People v. Breverman* (1998) 19 Cal.4th 142, 162 [77 Cal.Rptr.2d 870, 960 P.2d 1094].) A killing committed in a heat of passion on sufficient provocation is voluntary manslaughter. (*People v. Jackson* (1980) 28 Cal.3d 264, 305 [168 Cal.Rptr. 603, 618 P.2d 149].) . . . [¶] 'The heat of passion requirement for manslaughter has both an objective and a subjective component. [Citation.] The defendant must actually, subjectively, kill under the heat of passion. [Citation.] But the circumstances giving rise to the heat of passion are also viewed objectively. . . . "[T]his heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable

17

person under the given facts and circumstances . . . .”’ (*People v. Steele* (2002) 27 Cal.4th 1230, 1252 [120 Cal.Rptr.2d 432, 47 P.3d 225].)” (*People v. Rountree* (2013) 56 Cal.4th 823, 855.)

### 3. Analysis

Contrary to defendant's assertion, there was no evidence that defendant's grandmother did or said anything on the morning of her murder that would have provoked a reasonable person under similar circumstances to attack her violently. Although the evidence showed that there was tension between defendant and his grandmother due to his drug abuse and lifestyle, none of the evidence about the incident on the morning of the murder supported a reasonable inference that defendant was provoked. That evidence showed that both defendant and his grandmother were sleeping when his grandfather left for work that morning. Sometime later, defendant broke the bathroom mirror with his fist, causing his grandmother to react by telling him she was frustrated by and “fed up” with his behavior. Defendant's grandmother then telephoned Leticia because he was “acting crazy and breaking things.” That conversation ended with a scream from defendant's grandmother.

There is nothing about the facts relating to the incident that suggests or implies that defendant's grandmother said or did anything that would have caused a reasonable person under similar circumstances to become enraged to the point that he or she would violently attack a close family member. To the contrary, a reasonable person under similar circumstances would have expected defendant's grandmother to express frustration and exasperation over defendant's behavior. Therefore, the trial court did not err by refusing to instruct the jury on heat of passion.

### C. Custody Credits

In a supplemental brief, defendant contends that the trial court awarded him one fewer day of actual custody credit than that to which he was entitled. The Attorney General agrees.

The sentencing minute order and the amended abstract of judgment reflect that defendant was awarded 827 days of actual custody credit. Under section 2900.5 and the case law interpreting that section, a defendant is entitled to custody credit for all actual days of confinement, including the date of his or her arrest and the date of sentencing. (*People v. Morgain* (2009) 177 Cal.App.4th 454, 469; *People v. Browning* (1991) 233 Cal.App.3d 1410, 1412.) Given the date of defendant's arrest—December 16, 2012— and the date of sentencing—March 23, 2015—defendant was entitled to 828 days of actual custody credit, not the 827 days awarded by the trial court.

Because a sentence that fails to award the amount of custody credit to which a defendant is legally entitled is unauthorized, it may be corrected whenever it is discovered. (*People v. Taylor* (2004) 119 Cal.App.4th 628, 647.) Accordingly, defendant's sentence must be modified to reflect that he was entitled to 828 days of actual custody credit.

## DISPOSITION

Defendant's sentence is hereby modified by awarding defendant one additional day of actual custody credit, for a total of 828 days of actual custody credit, and the matter is remanded to the trial court with instructions to correct the sentencing minute order and abstract of judgment to reflect this modification and to deliver the modified judgment to the California Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

RAPHAEL, J.[*]

We concur:

TURNER, P.J.

BAKER, J.

---

[*]     Judge of the Superior Court of the County of Los Angeles, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.